OPINION OF THE COURT
Alice Schlesinger, J.
This matter came before me on September 23, 1986 for an assessment of damages and a hearing on attorney’s fees. The plaintiff, Long Island Trust Company, N. A., as the holder of a retail installment contract sued defendant Leonard Williams for a deficiency judgment. Williams had bought a used Cadillac from Potamkin in 1984, and Potamkin had assigned the contract to Long Island Trust. When Williams fell behind in his payments, plaintiff repossessed the car and arranged for its resale. Because the amount realized from the sale was less than the outstanding contract price, plaintiff sued defendant for the deficiency.
Plaintiff moved in Civil Court for summary judgment. Williams, who did not have counsel, failed to file opposing papers. However, at the date scheduled for oral argument he appeared and told the court that he had been "informed when he surrendered the car that he would not be required to pay anymore because the car would be sold for at least the amount unpaid on the installment agreement” (quoting in part from the Civil Court decision denying summary judgment to Long Island).
The plaintiff appealed the denial of their summary judgment motion to the Appellate Term. The Appellate Term reversed the lower court, finding that summary judgment was appropriate as any new "agreement” that Williams had made with Long Island at the time he turned in his car was "not enforceable against the plaintiff, since it is not in writing, varies the terms of the installment contract, and is not supported by sufficient consideration”. The matter was then remanded for an assessment of damages.
The evidence presented by plaintiff at the hearing consisted of the testimony of Michael Schoen, collection manager for Long Island Trust Co. Schoen stated that the retail installment contract that defendant Williams had entered into with Potamkin had been assigned to them. This contract was admitted into evidence as plaintiff’s No. 1.
The contract which was dated January 13, 1984 showed the following specifics. The price of the 1979 Cadillac was *748 $9,775.09 (including sales tax of $775.09). Williams made a down payment of $1,500.59. There were additional charges of $569.58, bringing the unpaid balance to $8,844.08. Finance charges of $2,746.48 at an interest rate of 18.50% were then added, bringing the total to $11,590.56. Williams was to pay $321.96 in 36 monthly payments beginning February 12, 1984.
The general terms of the contract appeared on the reverse side. There paragraphs 13 through 16 discuss what procedures were to be used in the event of a repossession of the car. It gave the seller the right after repossession to sell the car at public or private sale. Included here was the requirement that the buyer be sent "written notice of sale at least 10 days before the sale”.
The contract also referred to the buyer’s obligation to pay the difference to the seller between the resale price and what he owed, and to the seller’s obligation to refund any surplus to the buyer.
Finally, paragraph 19 stated that New York law applied, and paragraph 20 referred to notices which the seller must send to the buyer at least five days before he must act except for "(10 days for notice of resale)”.
Schoen then continued his testimony stating that defendant had made six payments which amounted to $1,931.76. Apparently, some time in August of 1984 Williams became unemployed and notified the bank that he could not continue to make the monthly payments. It appears that defendant was not yet in default. At any rate, he was told to bring in the car, which he did on or about August 27, 1984.
Plaintiff’s witness then testified that the car had been then sold at public auction for $3,900, presumably on October 4, 1984. Schoen said that there were $198 in expenses relating to the sale, leaving plaintiff net proceeds of $3,702.
He then recited his calculations as to the $4,515.78 amount which plaintiff claimed Williams owed on this deficiency. The "total payments” originally due under the contract were $11,590.56. Williams had paid $1,931.76, but since this apparently included a $30 late fee, he was credited with only $1,901.80, which was then deducted from the $11,590.56, leaving a balance of $9,688.76. From this figure plaintiff deducted their net proceeds from the sale of $3,702, leaving $5,986.76. To this figure was added a $5 fee, bringing the new number to $5,991.76. Williams was then credited with a refund for unearned interest and life insurance of $1,475.98, leaving a final balance of $4,515.78.
*749 The attorney for Long Island Trust, Kenneth Zitter, then testified regarding the amount of time spent on this action to support his claim for attorney’s fees. Attorney’s fees are discussed in paragraph 12 of the contract, which states that the buyer is liable for such fees in an amount up to 15% of the amount due. This 15% figure was $677.36, and Zitter explained how the actual charges for the work he performed came to more than this amount. Thus, the total amount sued for was $5,193.14, without costs.
The defendant Joseph Williams then took the witness stand. He had been asking questions, as was the court, during the presentation by Schoen, and these did raise an issue concerning whether defendant had been sent or had received notice of the resale. Since plaintiff did not then have proof of notice, a continuance was granted to September 26, 1986.
On that day plaintiff produced and had admitted into evidence a four-page exhibit consisting of a copy of a "Notice” from "ban credit service agency inc.” signed by Kingsley E. Colman, licensed auctioneer, a green U. S. Postal Service receipt card for certified mail, a second postal form giving a typed list of 12 articles sent to 12 addresses, and a copy of the front and back of the earlier mentioned green postal receipt.
The notice is dated September 21, 1984. It refers to the Cadillac and contract in question and tells the debtor that the car will be sold at public auction at 126-30 Willets Point Blvd., Corona, New York, at 11:00 a.m. on October 4, 1984. The earliest stamp which appears on the "postmark” section of the postal receipt card shows a date of September 26, 1986, which is eight days before October 4, 1984. The article number on the card matches the number of the notice. There is finally an unreadable signature which is purported to be that of defendant Leonard L. Williams.
The defendant was shown this card in court. He stated that he had never seen or received the notice, nor had he signed the card. The signature was neither his nor his wife’s.
Williams further testified in detail about the circumstances surrounding his default. He said he had had conversations with a Ms. Zinn, an employee of the plaintiff company. He told her he had lost his job and asked her for a second loan with smaller payments. She told him she could not do this. She suggested he take the car back and get a cheaper car. He attempted to do this, but Potamkin would not agree.
In the second conversation, Ms. Zinn told Williams he must *750 turn the car back and take it to Flushing. Williams testified that he asked Zinn for the book value of the car, and she told him that it was between $6,800 and $7,000. She said they would sell the car and implied that it would be for the book value price. Because he only had $6,912.32 to pay on the original price, less $1,500 deposit he had already paid, he made no further attempt to sell the car on his own. He stated emphatically in court that Ms. Zinn had never mentioned a sale at a public auction because he would not do that, as he knew about public auctions. A few days after this conversation he brought back the car as directed.
After Williams testified, the court specifically asked plaintiff’s attorney if he wished a continuance to produce further witnesses. I was specifically thinking of Ms. Zinn, or the auctioneer, or someone with specific information and/or knowledge of practices and value in the selling of automobiles. Counsel said he did not, and plaintiff rested. I reserved decision.
In researching this matter I kept in mind that the plaintiff here had been awarded partial summary judgment. However, that decision was correctly based on the narrow grounds then before the court; namely, were there factual issues as to the existence of a new agreement. And, of course, for the reasons stated by the Appellate Term, there was no new agreement as a matter of law.
The decision I have made, one I believe is compelled by the law in this State, turns rather on the question whether the plaintiff here sufficiently complied with statutory requirements to entitle it to damages in the form of a deficiency judgment.
At common law a seller who reclaimed and resold property could not also sue the buyer for installments on the contract or for the price (Earle v Robinson, 157 NY 683 [1898]). The theory there involved an election of remedies.
However, the Uniform Commercial Code with its comprehensive framework of the reasonable rights and remedies of buyers and sellers changed that theory. A seller now has various alternatives, as long as he acts in a commercially reasonable manner.
The retail installment contract which exists in this case, where the seller-creditor retains a security interest in the collateral, involves a secured transaction. This situation thus falls under UCC article 9. Specifically, section 9-504, entitled *751 "Secured Party’s Right to Dispose of Collateral After Default; Effect of Disposition”, sets the parameters in these cases.
Section 9-504 (3) details exactly how the disposition of the collateral must be made. The disposition may be effected in any one of various ways, "but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable.” Also, with regard to a public sale, there must be "reasonable notification of the time and place”.
In this hearing the evidence put forward by both sides, Leonard Williams via his credible testimony about his conversations with Ms. Zinn and perhaps more significantly about the contract itself entered into less than 10 months before the car was resold, convinced me that close scrutiny of the transaction was required.
Williams stated that Ms. Zinn told him the book value of the car was $6,800 to $7,000. The contract for the car called for a price of $9,000, without tax or any extras. His total of payments with finance charges was considerably more: $11,590.56.
Williams returned the car on demand a little over seven months after signing the contract. The car was resold within weeks for only $3,900, less than half its supposed value earlier in the year.
In Central Budget Corp. v Garrett (48 AD2d 825 [1975]) the defendant on February 1, 1968 bought a 1963 Buick from plaintiff’s assignor under a retail installment contract for a purchase price of $1,627.50. A default occurred after only one payment of $62.64. The car was repossessed and sold by a licensed auctioneer in May for $300. Unlike the case at bar, details of the Garrett sale were presented, such as the number of persons attending, the length of time of the auction, the various bids, etc. The court there construed "commercially reasonable” under UCC 9-504 in that contract "to mean that a qualifying disposition must be made in the good faith attempt to dispose of the collateral to the parties’ mutual 'best advantage’ ” (supra, at p 825).
The court noted that it was not dispositive that a better price could have been gotten. However, it added that "discrepancies between the disposal and sale prices signal a need for closer scrutiny” (supra, p 826). Under such circumstances, the plaintiff must then affirmatively show that the disposition was commercially reasonable, and "in the absence of such a showing, [the court] will be compelled to deny recovery in a suit for *752 a deficiency judgment” (supra, at p 826). The Garrett court then did deny recovery.
This holding is not an isolated case. In Marine Midland Bank-Central v Watkins (89 Misc 2d 949 [1977]) the defendant bought a 1969 Lincoln car in June of 1972 agreeing to pay the sum of $5,081.38 under a retail installment contract. The automobile was repossessed in October of 1972 and sold in December. The proceeds obtained were $2,700 and the plaintiff sued for a deficiency judgment.
The Watkins court (supra) found a problem existed regarding the notice sent to defendant as it omitted the place of sale. Also, the court said that scrutiny of the sale was required because "the proceeds obtained less than six months after initial purchase were only about 55% of the amount originally financed.” (89 Misc 2d, at p 952.) The court stated further that under such circumstance there must be some affirmative showing that section 9-504 (3) was complied with in that the terms of the sale were commercially reasonable. Again, the court denied a deficiency judgment.
In Kohler v Ford Motor Credit Co. (93 AD2d 205 [1983]), Kohler purchased a car for $5,057.58. Sixteen months later it was repossessed and sold for $1,750. There was an allegation that the book value of the car at the time of resale was $3,675. This marked discrepancy between the sale and the disposal price sufficiently raised issues as to the commercial reasonableness of the sale to defeat a motion for summary judgment.
All of my research shows that when the secured party elects to repossess and resell, he must comply with UCC 9-504 (3) and prove that he did. (See, e.g., Derami, Inc. v John B. Cabot, Inc., 273 App Div 717 [1948]; Federal Deposit Ins. Corp. v Herald Sq. Fabrics Corp., 81 AD2d 168 [1981]; Flickinger Co. v 18 Genesee Corp., 71 AD2d 382 [1979].) The burden of proof remains with the secured party seeking a judgment once the issue has been raised.
In the case at bar, a wide discrepancy existed between the contract and the resale price less than 10 months later, and unrefuted statements regarding book value were attributed to an employee of plaintiff company. These facts together were sufficient to raise an issue whether the sale was commercially reasonable. Plaintiff thus had to show that "the method, manner, time, place and terms” of the resale were reasonable. (UCC 9-504 [3].)
However, the plaintiff put in no evidence at all of the *753 procedures leading up to the sale (advertising, contacting interested parties, displaying the car, etc.) and no evidence of what transpired at the sale itself. Therefore, I find that they have failed to prove compliance with the statute and that the sale was performed in a commercially reasonable manner.
Not only must the plaintiff show that he disposed of the property in a commercially reasonable way, he must also show the disposition was made pursuant to UCC 9-504 (3) or to the terms of his agreement in that proper notice of the pending public sale was given. The purpose of the notice requirement is "to give the debtor an opportunity to protect his interest in the collateral by exercising any right of redemption or by bidding at the sale, to challenge any aspect of the disposition before it is made, or to interest potential purchasers in the sale, all to the end that the merchandise not be sacrificed by sale at less than the true value” (First Bank & Trust Co. v Mitchell, 123 Misc 2d 386, 393).
Section 9-504 (3) directs that "reasonable notice” of the sale must be given. It is not further defined. UCC 9-501 (3) (b) says to the extent that this statute gives rights to the debtor and imposes duties on the secured party, the rules cannot be waived or varied. However, it adds that "the parties may by agreement determine the standards by which the fulfillment of these rights and duties is to be measured if such standards are not manifestly unreasonable”.
In our case the parties did exactly that in a contract drawn up by the secured party. Twice the agreement directs that the buyer be sent notice of the sale at least 10 days before. Therefore, despite the fact that the letter of notice is dated September 20, 1984, the "proof’ of mailing submitted by the plaintiff shows a date of September 26, 1984, less than the mandated 10 days before the sale.
Many courts have totally precluded recovery for failure to comply with notice requirements. (See, e.g., Avis-Rent-A-Car Sys. v Franklin, 82 Misc 2d 66 [1975]; Marine Midland Bank-Central v Watkins, supra; Banker’s Trust Co. v Steenburn, 95 Misc 2d 967 [1978].)
I find based on the evidence adduced at the hearing that plaintiff Long Island Trust did not comply with the terms of the agreement or with the statute in that the notice of the resale was insufficient. I do believe that Williams failed to receive the notice, but my finding on insufficiency is based on the plaintiff’s proof of eight days rather than 10-day notice. Does that mean that no recovery is due them?
*754 Some courts do believe that it does, although the UCC specifically does not say this. However, the evolving position seems to be that in the situation where the creditor has failed to prove he has disposed of the property in compliance with section 9-504 (3) he is still entitled to recovery if he is able to prove at trial the amount of the debt, the fair market value of the security, and the resulting deficiency. A presumption exists that the security is equal to the debt and the secured party has the burden of proof to overcome such a presumption. (Security Trust Co. v Thomas, 59 AD2d 242 [1977]; Flickinger Co. v 18 Genesee Corp., supra; Matter of Zsa Zsa Ltd., 352 F Supp 665.)
Here, Long Island Trust elected to put in no evidence of the true market value of this automobile. In Acuri v Figliolli (91 Misc 2d 831 [1977]), the trial court denied a deficiency judgment sued for on the resale of a Rolls Royce. The contract price was $9,500 and the car was resold for only $5,600. The only testimony the seller gave was that the car was sold to Hempstead Motors for $5,600. Because plaintiff had made no showing of the actual market value of the vehicle, judgment was denied. In Derami v Cabot, Inc. (supra, p 723), the court similarly denied judgment based on "the absence of testimony by anyone familiar with this type of business, that such damage is established on the basis of this record without being informed on whether the sale represents either the market price in case of an available market for the goods, or that the resale was a fair test of the actual value in the absence of an available market.”
I am at a loss to know what the actual market value of this Cadillac was on the day it was sold. Therefore, I must presume that its value was equal to the debt. The plaintiff here was given ample opportunity to submit testimony and evidence as to whether the sale was commercially reasonable in the first place and what the true market value of the car was in the second. It has failed on both counts.
Therefore, based on the credible evidence, the documents presented, UCC 9-501 and 9-504, and the overwhelming case support, the plaintiff is denied any judgment on its claim of an alleged deficiency, as it has failed to prove its entitlement to one.