**In the Matter of EXCELLO PRESS, INC., Debtor.**

**Appeal of METLIFE CAPITAL CREDIT CORPORATION.**

**No. 88-2726.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 15, 1989.

Decided Nov. 20, 1989.

Rehearing and Rehearing En Banc Denied Dec. 28, 1989.

Alexander Terras, Robert J. Peters, Mitchell E. Jones, Epton, Mullin & Druth, Chicago, Ill., for Metlife Capital Credit Corp.

Ronald R. Peterson, Larry M. Wolfson, Jenner & Block, Daniel A. Zazove, Towbin & Zazove, Chicago, Ill., for Excello Press, Inc.

Before COFFEY, EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

Secured creditors are usually the lucky ones in a bankruptcy proceeding, for they can turn to specific assets to satisfy their claims rather than joining the queue of claimants. Many times, however, the creditor is under-secured and must join the unsecured creditors to get back a portion of what is still owed. This case is about what such a creditor must do to share in the remaining assets.

## I

Excello Press was a commercial printer in Elk Grove, Illinois; now it is a bankrupt. It filed under Chapter 11 in October 1985. Having tried, and failed, to sell the business, see *The Excello Press, Inc. v. Maxwell Holdings, Inc.*, 1989 WL 69273, 1989 U.S. Dist. LEXIS 7665 (N.D.Ill.1989) (suit against Maxwell for refusing to go through with its purchase of Excello), it is in the process of liquidation.

In late 1980 Metlife Capital Credit Corp. sold Excello two web presses (web presses print on continuous rolls of paper), an M110 and an M1000, for a little more than $3 million to be paid over ten years. Metlife retained a security interest. By the time of the bankruptcy Excello still owed Metlife about $2.7 million. Metlife attempted to collect from Excello under Article Nine of the Uniform Commercial Code, which governs a debtor's default under a security agreement. See U.C.C. § 9–501(1).[1] The parties agree that New York's interpretation of the UCC governs, as the contract provides.

To liquidate its collateral, Metlife required a modification of the automatic stay imposed by § 362(a) of the Bankruptcy Code. 11 U.S.C. § 362(a). On April 4, 1986, the bankruptcy court entered an agreed order, which permitted Metlife to sell the two presses. Metlife promised to remove them from Excello's plant by April 30. The agreement also capped Metlife's deficiency claim at $900,000 should the presses fetch less than the $2.7 million debt—as they did. Metlife sold each press privately for $550,000, the M1000 on April 23 and the M110 in June. This left Excello's debt at more than $1.6 million, U.C.C. § 9–504(2), and Metlife filed the maximum claim of $900,000, to which Excello and its unsecured creditors' committee objected. The bankruptcy court held a hearing in November to resolve the dispute.

Over three days of testimony, Metlife argued that it had sold the presses in a commercially reasonable fashion, had received the fair market value, and was entitled to its deficiency judgment. Four witnesses testified that Metlife began to look for buyers in December 1985. Harris, the manufacturer, was enlisted to help in the marketing effort. More than 30 of the 150 largest printers were solicited, as were 13 other prospects and nine brokers in 15 states. Metlife introduced an appraisal

---

1. Metlife argued to the bankruptcy judge that the financing agreements covering the presses are leases, as titled. Relying on *In re Marhoefer Packing Co.*, 674 F.2d 1139, 1144–45 (7th Cir. 1982), the judge found that in substance they are security agreements. 83 B.R. 539, 542 (Bankr.N.D.Ill.1988). The parties do not question this determination on appeal, so neither shall we.

dated March 1985, filed as part of the bankruptcy petition, estimating that the two presses together were worth $1.2 million. Excello owned one each of the same models clear of liens; it valued these at $1.55 million, the difference likely reflecting that each of Excello's presses could print five colors. (Metlife's could print only four.) Excello sold these presses at a public auction and received a total of $950,000. The difference might have tracked a change in the market, but the only testimony on the state of the market for presses of this kind was excluded as hearsay. Finally, Metlife observed that the cap on its deficiency judgment gave it every incentive to maximize the return on the presses. Its deficiency judgment was going to be $900,000 unless it managed to get more than $1.8 million for the two presses, which was unlikely. So every extra cent received on the sale would go straight to its treasury, while the estate would pay out less than 100 cents on the dollar for any judgment, already limited by the cap, it obtained. (Metlife's $900,000 claim is worth only about $200,000.)

At the close of Metlife's case, Judge James granted judgment in Excello's favor. See Bankr.R. 7041 (applying Fed.R.Civ.P. 41 in adversary proceedings). Excello argued that Metlife had not proved that it had given notice and conducted a commercially reasonable sale as required by the UCC. Metlife had mailed a written notice on April 23, the day before the first sale was finalized, simply stating that it was selling the presses, without indicating when. Relying on *Executive Financial Services, Inc. v. Garrison*, 722 F.2d 417 (8th Cir.1983) (Missouri law), Judge James predicted that New York would establish that only written notice would satisfy the command that "reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor". U.C.C. § 9–504(3). The April 23 notice was not "reasonable notification", he found. When notice is not given, New York law creates a presumption that the collateral's fair market value at the time of the sale is equal to the amount of the debt.

Judge James concluded that Metlife had not overcome this presumption. He would not consider the price Metlife had received at its sale because he rejected Metlife's employees' testimony about the sale as coming from biased parties. The other evidence was not enough to convince him that the presses were worth less than $2.7 million (the amount of the debt): the appraisal was almost two years old, the testimony about the market from Metlife employees was inadmissible hearsay, the prices paid at the auction of the Excello presses were "immaterial". What was missing? "[T]estimony of persons familiar with the business to apprise the Court of what is a fair market price of available goods—or available market for these goods".

Judge James reiterated these determinations when he denied Metlife's motion for reconsideration, and added a new ground for disregarding the price obtained from the sale: because Metlife hadn't given notice, it could not use the price achieved at the sale as evidence of market value. On this view, whether the sale had been conducted in a commercially reasonable fashion is irrelevant. 83 B.R. 539, 543 (Bankr. N.D.Ill.1988).

The district court affirmed. 90 B.R. 335 (N.D.Ill.1988). The judge found it unnecessary to determine whether New York would require written notice, because Metlife had not shown that it gave adequate oral notice. Agreeing that New York would require Metlife to rebut a presumption that the presses had a market value of $2.7 million, he deferred to the bankruptcy court's determination that the presumption had not been overcome and did not decide whether New York would prohibit recovery in the absence of notice. He relied on *Colorado Leasing Corp. v. Borquez*, 738 P.2d 377, 380 (Colo.App.1986) (interpreting Colorado law), for the proposition that prices from sales that violate any provision of § 9–504(3) are not evidence of fair market value.

■ Metlife's appeal invokes 28 U.S.C. § 158(d). The bankruptcy has not been wound up, but the denial of all of Metlife's claim is a final decision. *In re Morse Elec-*

*tric Co.*, 805 F.2d 262, 264–65 (7th Cir. 1986). Metlife contends that written notice is not a precondition to a deficiency judgment and that the district court erred when it found that no oral notice had been given. Even if the notice was inadequate, Metlife continues, the bankruptcy judge erred in finding that the fair market value of the presses had not been established.² Excello replies that factual findings should not be disturbed unless clearly erroneous, e.g., *In re Ebbler Furniture and Appliances, Inc.*, 804 F.2d 87, 89 (7th Cir.1986), which it submits they are not.

## II

The outcome turns on U.C.C. § 9–504(3), which sets out a secured party's obligations in disposing of collateral:

> Disposition of the collateral may be by public or private proceedings ... [E]very aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market ... reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor if he has not signed after default a statement renouncing or modifying his right to notification of the sale.

The UCC doesn't define either "commercially reasonable" or "reasonable notification"; it also does not explain how these obligations relate to an action for deficiency. In order to sort this dispute out, we must look at how this subsection fits into the rest of Article Nine.

## A

■ Both of the courts below started by asking whether Metlife had given "reasonable notification", assuming the answer

would affect recovery of the deficiency. The significance of notice is not so obvious, however. The Code and its official comments are silent about the effect of non-compliance with § 9–504(3) on a deficiency action; the drafters of Article Nine did not consider the question. Grant Gilmore, 2 *Security Interests in Personal Property* § 44.9.4 at 1264 (1965). The only provision speaking to the debtor's entitlements is § 9–507(1): "If the disposition has occurred the debtor ... has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this Part." Perhaps this remedy for non-compliance is exclusive—if the secured party has not fulfilled its obligations, the debtor can counter-claim for or obtain a set-off of any damages suffered in consequence of a commercially unreasonable sale or inadequate notice. Some courts have construed Article Nine this way. E.g., *Commercial Credit Corp. v. Wollgast*, 11 Wash.App. 117, 521 P.2d 1191 (1974); *Barbour v. United States*, 562 F.2d 19, 21–22 (10th Cir.1977) (Kansas law).

This approach is a logical outgrowth of the common law's allocation of responsibilities. An action for deficiency is one form of action for payment of a debt: the sale of the collateral is partial satisfaction. In the traditional debt action, the plaintiff need only establish that a debt is owed and its amount. Payment is an affirmative defense. A debtor's challenge to the disposition of collateral is a complaint that the payment, in the form of the repossessed collateral, is worth more than the credit given by the lender: there is no question that the debtor owes the lender, only how much of the debt has been repaid.

Attractive as this might be, it is a minority position among the states, and New York has evinced little interest in it.³ New

---

**2.** Metlife also complains that the presumption only requires the secured party to come forward with some evidence to dispose of the presumption; the bankruptcy judge required more. Since this argument is raised for the first time on appeal, we do not decide the question.

**3.** One New York appellate court seems to have adopted this position: "In any event, the failure of plaintiff to comply with the provisions of [§ 9–504(3) ] would not discharge the defendant from all liability under the contract. If the

York courts, in line with the majority of the other states' courts, say that compliance with § 9–504(3) is part of the creditor's proof in a deficiency action. And even though there is nothing in the Code about who shall have the burden of persuasion with respect to compliance, these courts are nearly unanimous in assuming without discussion that it belongs to the secured party. *General Electric Credit Corp. v. Durante Brothers & Sons, Inc.*, 79 A.D.2d 509, 433 N.Y.S.2d 574, 576 (1st Dept.1980); *First National Bank v. G.F. Clear, Inc.*, 93 A.D.2d 925, 462 N.Y.S.2d 327, 329 (3d Dept.1983) (citing *General Electric Credit Corp.*); *FDIC v. Forte*, 144 A.D.2d 627, 535 N.Y.S.2d 75, 77 (2d Dept.1988); James J. White & Robert S. Summers, 2 *Uniform Commercial Code* § 27–16 at 617 n. 1 (3d ed. 1988) (collecting cases). Pursuing the analogy to the debt action, this is akin to placing on the creditor the burden of proving non-payment.

If secured parties are not likely to maximize the price obtained for repossessed collateral then it might be sound to place on them the burdens of production and persuasion, supplying an incentive to do so. A belief that secured parties consistently do not maximize has been deployed in support of a conclusion that all deficiency judgments should be barred. Philip Shuchman, *Profit on Default: An Archival Study of Automobile Repossession and Resale*, 22 Stan.L.Rev. 20 (1969) (study of 89 car repossessions in Connecticut). But why shouldn't they maximize? Even if the secured party could be assured of a judgment for the full deficiency, why would it forgo a dollar today for the chance to enforce a deficiency judgment tomorrow? The UCC provides that the proceeds from the sale of the collateral are applied first to the expenses incurred in its disposition; the remainder goes to satisfy the debt. U.C.C. § 9–504(1)(a). So even if the return after expenses is small, the secured party will expend every cost-justified effort because it prefers money now to judgment later. See Alan Schwartz, *The Enforceability of Security Interests in Consumer Goods*, 26 J.L. & Econ. 117, 126–27 (1983) (demonstrating that rational creditors will maximize sale prices of repossessed collateral). Add the uncertainty of recovery in litigation and this preference for cash grows stronger. That the debtor has defaulted is an indication that it is unlikely to be good for all of any judgment the creditor is able to get. See White & Summers, 2 *Uniform Commercial Code* § 27–14 at 612. This case illustrates the point. Every dollar extra that Metlife got for the presses went straight into its pockets. Even if its possible judgment had not been capped at $900,-000—$700,000 less than it was owed after selling the presses—it still would not have recovered more than 22¢ on the dollar. What reason could Metlife have had to do anything but maximize the resale price? True, it would have had little incentive to maximize any surplus (which must be paid to the debtor under § 9–502(2)), but all agree that the majority of cases, like this one, involve creditors who are under-secured.

One treatise argues that secured parties should bear the burden because they are in control of the procedures called into question. White & Summers, 2 *Uniform Commercial Code* § 27–16 at 617–18. This, however, is at best a reason to impose on them the burden of production, not the burden of persuasion. At least one court has adopted this approach. *Karlstad State Bank v. Fritsche*, 374 N.W.2d 177 (Minn. App.1985). Another justification for laying the burden on the creditor might be that the creditor as plaintiff must prove every element of its case, including compliance with § 9–504(3). But this begs the question: *why* is compliance with § 9–504(3) an "element" of the claim? One only need think about the situation where the lender is over-secured and the debtor is owed the surplus to see the problem. If enough money is realized from the sale of the collateral to cover the debt, the debtor may have to sue the lender under § 9–507(1) if it

defendant is prejudiced by the manner of sale, defendant is entitled to all damages caused thereby. (Uniform Commercial Code, § 9–507, subd. [1] )." *Stanchi v. Kemp*, 48 A.D.2d 973, 370 N.Y.S.2d 26, 28 (3d Dept.1975). No other New York court has followed in its footsteps.

thought the surplus was not as great as it could have been. Many courts say that the debtor, as plaintiff, must prove that the creditor has not complied with § 9–504(3). E.g., *First National Bank v. Holston,* 559 P.2d 440, 444 (Okla.1976); *Hansen & Sons, Inc. v. Crowley,* 57 Wis.2d 106, 203 N.W.2d 728, 732 n. 4 (1973); cf. *Adams State Bank v. Navistar Financial Corp.,* 229 Neb. 334, 426 N.W.2d 525, 527–28 (1988); *Transport Equip. Co. v. Guaranty State Bank,* 518 F.2d 377, 384 (10th Cir.1975) (Kansas law); but see *K.B. Oil Co. v. Ford Motor Credit Co., Inc.,* 811 F.2d 310, 314 (6th Cir.1987) (Ohio law). Yet there is no reason to make the burden of persuasion turn on the amount realized at the sale or the sequence of pleadings.

Despite our doubt that the courts of New York have fully considered the subject, we have no doubt about how New York's courts would approach the question if this case were pending there. Although no New York court has given reasons, and although the cases seem to reflect assumptions about a subject that has not been argued by the parties, a pervasive assumption is good evidence about how the courts will decide. New York regularly, albeit without explanation, lays the burden on the secured creditor. What happens when this burden is not met, however, is less clear.

B

Excello argues that Metlife did not comply with the notice requirement of § 9–504(3) because written notice is required and Metlife didn't give it. The UCC does not provide any definition of "reasonable notification", and, as with most of the issues raised in this appeal, the Court of Appeals of New York has not addressed the subject. Metlife points to several trial court decisions applying New York law holding that oral notification achieving actual notice is sufficient under § 9–504(3). *First Bank & Trust Co. v. Mitchell,* 123 Misc.2d 386, 473 N.Y.S.2d 697, 702 (Sup.Ct. 1984); *Chase Manhattan Bank v. Natarelli,* 93 Misc.2d 78, 401 N.Y.S.2d 404, 412 (Sup.Ct.1977). The bankruptcy judge disregarded these cases and agreed with Ex-

cello, relying on a case from the Eighth Circuit construing Missouri law. The Eighth Circuit focused on the phrase "shall be sent":

It is difficult to believe that, in choosing this language, the draftsmen contemplated oral notice as being sufficient.... Section 9–504 requires that the secured party "send" notice and 1–201(38) tells us that ' "Send" in connection with any writing or notice means to deposit in the mail or deliver for transmission by any other usual means of communication with postage provided for and properly addressed....' It is most difficult to fit an oral message into the quoted language. Rather the subsection seems to contemplate mail or telegraphic notice.

*Executive Financial Services, Inc. v. Garrison,* 722 F.2d 417, 418–19 (8th Cir.1983), quoting from White & Summers, *Uniform Commercial Code* § 26–10 at 1112 (2d ed. 1980). Yet the UCC also provides that a person has "notice" of a fact "when (a) he has actual knowledge of it; or (b) he has received a notice or notification of it; or (c) from all the facts and circumstances known to him at the time in question he has reason to know that it exists." U.C.C. § 1–201(25). The very next section of Article Nine implies that the drafters did not use "send" to imply "written". U.C.C. § 9–505(2) ("[w]ritten notice ... shall be sent ...."). See *MBank Dallas, N.A. v. Sunbelt Manufacturing, Inc.,* 710 S.W.2d 633 (Tex.App.1986) (§ 9–504(3) therefore allows oral notice). "Send" can mean "give", which may be done orally. There is little reason to rely on the definition of "send" over that of "notice" in order to impose the additional requirement of a writing. The purposes of the notice requirement are to allow the debtor to ensure that the sale is commercially reasonable, find another buyer, or redeem the debt. *First Bank & Trust Co.,* 473 N.Y.S.2d at 702; see White & Summers, 2 *Uniform Commercial Code* § 27–12 at 598–99. If the debtor knew enough to monitor the sale, that is sufficient. Did Excello receive notice in time to come up with another buyer or to request information on Metlife's plans so as to challenge them? If so, then Metlife fulfilled its

obligation to provide "reasonable notification".

 Unfortunately, this question remains unanswered. The district court's determination that Excello did not have actual notice flowed not from the facts but from its assumption that New York would follow *Spillers v. First National Bank*, 81 Ill.App.3d 199, 36 Ill.Dec. 477, 480, 400 N.E.2d 1057, 1060 (4th Dist.1980) ("It therefore became the duty of [the secured party] to notify petitioner of all and every proposed private sale, or sales. Simply being aware of an impending sale is insufficient.") (citation omitted). *Spillers* read the phrase "any private sale" in "reasonable notification of the time after which any private sale or other intended disposition is to be made" to mean "all and every proposed private sale". *Ibid.* But this ignores the "after which" language. Notice of a private sale need only let the debtor know how much time he has before the collateral will be sold, not to whom or even if a definite buyer is lined up. To be reasonable, notice must assure that the debtor has sufficient time to take appropriate action to protect its interests. *Fitzpatrick v. Bank of New York*, 124 Misc.2d 732, 480 N.Y.S.2d 157, 159 (2d Dept.1983); U.C.C. § 9–504(3) Official Comment 5. Notice provides time for the debtor to protect itself: to bid on the collateral, to find other buyers, to get involved in the process of selling it. There is nothing in § 9–504(3) which requires the creditor to tell the debtor anything more than the "time after which" the disposition will occur, so any notice after the first one indicating "the time after which" would be redundant. "Reasonable notification" does not relieve the debtor of all responsibility to act to defend its self-interest; the secured party need not put forth a steady stream of notices, while the debtor sits back and does nothing. Similarly, Excello's contention that they had to be notified of the time and place of the sale is silly. Knowing time and place is helpful for a public sale where monitoring the actual bidding and presentation of the collateral is feasible—indeed it is required by § 9–504(3). When a sale is private, by contrast, the debtor needs to know how much time it has to scare up buyers, which is why the statute requires the creditor to tell the debtor the "time after which" the sale may occur, and why only one notice is required.

 Metlife believes that its notice of April 23 was "reasonable notification" of the sale of the second press, which did not occur until June. But the notice baldly stated that the presses were going to be sold, without giving a "time after which" the sale was to occur. So Excello did not know how long it had to procure buyers, at least from the written notice. Metlife also urges us to rule that it gave "reasonable notification" because Excello had actual notice. By February 28, Excello knew that Metlife intended to sell the presses through a private sale rather than Excello's public auction. Excello helped Metlife identify potential buyers, and on several occasions assisted Metlife in demonstrating the presses to interested prospects, both proving, according to Metlife, that Excello had plenty of time to act. Since removing the presses from the debtor's plant was a very expensive proposition and likely to decrease the presses' value, Excello must have known that Metlife had a strong incentive to close a sale before April 30. All of this, Metlife argues, is enough to find that Excello had actual notice. That's a strong logical case, but whether a party actually knows something is a question of fact. And Excello has not had an opportunity to put in any evidence. Since this case must be remanded in light of the standards set out in Part II(C), we leave this question to be considered in the first instance by the bankruptcy court.

### C

 Excello presses on us an argument that the bankruptcy court rejected and the district court did not reach: that New York would bar a deficiency judgment if notice were inadequate. Several states have taken this position, see Ronald A. Anderson, 9 *Anderson on the Uniform Commercial Code* § 9–504:91 at 785 n. 20, § 9–504:96 at 789 n. 19 (3d ed. 1985) (collecting cases), as have some trial courts in New York. *Cred-*

*it Car Leasing Corp. v. DeCresenzo*, 138 Misc.2d 726, 525 N.Y.S.2d 492, 497 (N.Y. Civ.Ct.1988); *Leasco Data Processing Equipment Corp. v. Atlas Shirt Co.*, 66 Misc.2d 1089, 323 N.Y.S.2d 13, 15–16 (N.Y. Civ.Ct.1971); *Hertz Commercial Leasing Corp. v. Dynatron, Inc.*, 37 Conn.Supp. 7, 427 A.2d 872 (Conn.Super.1980) (New York law). We agree with the bankruptcy court, however, that New York would apply what has been termed the middle-of-the-road position (between barring a deficiency and leaving the debtor only a counterclaim under § 9–507(1)):

> [D]espite failure of the secured party to give notice of sale of the security to the debtor as provided by the statute, and even despite the creditor's failure to conduct the sale in a commercially reasonable manner, the creditor may still recover a deficiency judgment ... except that in such cases the secured creditor must prove the amount of his deficiency and that the fair value of the security was less than the amount of the debt. This is sometimes expressed by stating that in such cases there is a presumption that the security was equal to the debt and that the secured party has the burden of proof to overcome such presumption.

*Security Trust Co. v. Thomas*, 59 A.D.2d 242, 399 N.Y.S.2d 511, 513 (4th Dept.1977) (citations omitted); see also *Telmark, Inc. v. Lavigne*, 124 A.D.2d 1055, 508 N.Y.S.2d 737, 738 (4th Dept.1986); *Kohler v. Ford Motor Credit Co.*, 93 A.D.2d 205, 462 N.Y. S.2d 297, 300 (3d Dept.1983) (without mention of *Stanchi v. Kemp*, see note 4 *supra*); *Long Island Trust Co. v. Williams*, 133 Misc.2d 746, 507 N.Y.S.2d 993, 999 (Civ.Ct.N.Y.1986); Anderson, *UCC* § 9–504:92 at 786–87, § 9–504:97 at 791 n. 10 (collecting cases). The Second Department in the 1970s decided two cases using the absolute bar rule: *Central Budget Corp. v. Garrett*, 48 A.D.2d 825, 368 N.Y. S.2d 268 (2d Dept.1975) (failure to prove commercial reasonableness bars deficiency); *Avis Rent a Car System, Inc. v. Franklin*, 82 Misc.2d 66, 366 N.Y.S.2d 83, 85 (2d Dept.1975) (absence of notice bars deficiency). New York's highest court has not spoken on this issue. While one can

never be sure of predictions of state law, see, e.g. *First State Bank v. Hallett*, 291 Ark. 37, 722 S.W.2d 555, 556 (1987) (abandoning long-standing rebuttable-presumption rule in favor of the absolute bar rule), we do not believe that New York would abandon the other Departments' more recent decisions and return to a rule that makes it even harder to recover deficiencies. Other states have not been stampeding toward an absolute bar; the states seems to be about evenly divided. Although the absolute bar rule has the virtue of predictability, it produces a penalty out of line with the gravity of the omission; moreover, to the extent notice includes oral notice and actual knowledge, the absolute bar rule does not deliver on its promise of easy administration. We therefore conclude that the most recent appellate cases in New York are the best evidence of what New York's highest court would do.

Yet given that the secured party bears the burden of proving compliance with § 9–504(3), does this "rebuttable presumption" change anything? Not unless one takes the extra step, as bankruptcy and district courts did, of refusing to consider the price obtained after a sale without notice. This was, we believe, a step unauthorized by state law, for there is a substantial difference between discounting the weight of evidence and refusing to consider evidence. There may be good reason to discount the evidentiary value of the price, and to require other evidence of the fair market value, when the sale was not commercially reasonable: the price from a commercially unreasonable sale doesn't reveal much about the collateral's market value. And there may be good reason for believing that the failure to give notice decreases the likelihood that the sale was commercially reasonable, because lack of notice may remove from the process the party (the debtor) with the best ability to find buyers (and a good incentive to do so).

Even after discount, though, the sale conveys information. If despite the lack of notice the sale was commercially reasonable, the price is more than merely informative. The product of a commercially rea-

sonable sale *is* the fair market value. If the secured party can prove that the sale was commercially reasonable, it has proved the market value of the collateral. The bankruptcy court misunderstood the relation between the reasonableness of the sale and the market price when it said that the price from a sale without notice could be ignored, so that "Metlife's argument that its disposition of the presses was commercially reasonable becomes moot." 83 B.R. at 543. The price obtained in a commercially reasonable sale is not *evidence* of the market value, which can be discounted or thrown out. It *is* the market value. Whether the sale was commercially reasonable thus is the central inquiry. See *Bankers Trust Co. v. J.V. Dowler & Co.*, 47 N.Y.2d 128, 417 N.Y.S.2d 47, 50–51, 390 N.E.2d 766, 769 (1979) ("the touchstone of its obligations as a secured party was to dispose of the collateral in a 'commercially reasonable' manner"). The third-party evidence (such as an appraiser's estimate), which the bankruptcy judge thought essential to establish the market value and which the district court called superior "direct evidence", 90 B.R. at 339, is at best second-best. What someone pays in a commercially reasonable sale is the market price; an appraisal (that is, what an expert thinks someone would pay in a commercially reasonable sale) is useful only when the price of such a sale cannot be got at directly. If a creditor is able to meet the burden of proving that the sale was commercially reasonable, it has "rebutted the presumption", notice or not.

▆▆▆▆ Lack of notice may make a difference, but only because it is suggestive on the question whether the sale was conducted in a commercially reasonable fashion. The UCC gives it no talismanic significance and allows the omission of notice when other devices protect the debtor. See § 9–504(3), excusing notice when the sale takes place on a "recognized market" or notice is too expensive. In the end, the "principal limitation on the secured party's right to dispose of the collateral is the requirement that he proceed in good faith (Section 1–203) and in a commercially reasonable manner." U.C.C. § 9–507 Official

Comment 1. Whether a sale was commercially unreasonable is, like other questions about "reasonableness", a fact-intensive inquiry; no magic set of procedures will immunize a sale from scrutiny. *FDIC v. Forte*, 144 A.D.2d 627, 535 N.Y.S.2d 75 (2d Dept.1988); *First National Bank*, 462 N.Y.S.2d at 329 ("consideration must be given to the totality of the circumstances surrounding the entire proceedings") (citations omitted); see *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 671 (S.D.N.Y.1972), affirmed mem., 475 F.2d 1393 (2d Cir.1973). Failure to give notice is evidence of commercially unreasonable behavior. It might indicate that the secured creditor was trying to avoid the debtor's monitoring and call for closer scrutiny; yet the omission might have been innocent, a result of a speedy sale needed to maximize the return, or irrelevant (if the debtor had knowledge anyway). The choice of public versus private sale also depends on the circumstances. Judge James seemed to think that a public auction (such as that conducted by Excello) is always commercially reasonable, so that Metlife could be censured for proceeding otherwise. The right inquiry is whether a particular method of sale was the commercially reasonable way to proceed under *these* circumstances with *this* equipment. E.g., *Old Colony Trust Co. v. Penrose Industries Corp.*, 280 F.Supp. 698, 711–18 (E.D.Penn.), affirmed, 398 F.2d 310 (3d Cir. 1968) (Massachusetts law). And a party's good faith may be taken into account in evaluating whether the sale was on the up-and-up. *Id.* at 714.

▆▆▆ Some courts have talked about the possibility of a separate "proceeds test" to hold that the shortfall of the proceeds (compared with the debt) makes a sale commercially unreasonable without regard to the creditor's efforts to obtain a price as high as possible. E.g., *FDIC v. Herald Square Fabrics Corp.*, 81 A.D.2d 168, 439 N.Y.S.2d 944 (2d Dept.1981). A low price may signal the need for close scrutiny. A large deficiency might indicate the search for buyers had been inadequate; or it might simply reflect a greatly depreciated piece of collateral. *Sumner v. Extebank*,

88 A.D.2d 887, 452 N.Y.S.2d 873, 875 (1st Dept.1982) ("The low price paid and the lack of bidders were not the result of a commercially unreasonable sale, but were rather indicative of the lack of demand for a disabled vessel."), affirmed in relevant part, 58 N.Y.2d 1087, 462 N.Y.S.2d 810, 449 N.E.2d 704 (1983). So the "proceeds test" is simply another part of looking at the circumstances of the sale. Once the sale is shown to have been commercially reasonable, though, the size of the deficiency is irrelevant. U.C.C. § 9–507(2) ("The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner."); see also *In re Zsa Zsa Ltd.*, 352 F.Supp. at 670–72; *Mercantile Financial Corp. v. Miller*, 292 F.Supp. 797, 801 (E.D.Penn. 1968).

In the end, the court must decide what a reasonable business would have done to maximize the return on the collateral. It must consult "[c]ustoms and usages that actually govern the members of a business calling day-in and day-out [that] not only provide a creditor with standards that are well recognized, but tend to reflect a practical wisdom born of accumulated experience." *Bankers Trust Co.*, 417 N.Y.S.2d at 51, 390 N.E.2d at 769. That inquiry, abjured in the first instance by the bankruptcy court, must be the center of attention on remand.

### D

■■ In addition to deciding that commercial reasonableness is irrelevant, Judge James also looked at Metlife's evidence and suggested that it is insufficient. It is unclear to us that the judge gave this independent weight, but to the extent the judge meant this to be a finding of fact, we hold it clearly erroneous. Judge James said that the sale was commercially unreasonable because Metlife had not presented the testimony of disinterested third parties on the question of valuation; he disregarded the testimony of two Metlife employees who described what Metlife had done to procure the best possible price. There is no general rule in deficiency actions, or any others, that interested parties cannot provide competent testimony. A judge may not say: "In my court, the testimony of the parties counts for naught." Triers of fact must evaluate the testimony with greater specificity; some interested witnesses will be credible and others not so, and the court must try to determine which is which rather than reject everything out of hand.

The bankruptcy judge paid scant attention to aspects of this record that seem to us important to any evaluation of the commercial reasonableness of a sale, such as Metlife's exhaustive search for buyers and the need to move the presses by the end of April. The bankruptcy judge rejected Excello's own 1985 appraisal of these two presses at $1.2 million as too old, an unsupported decision: there is no evidence that the market had changed since the time it was made, and presses one year older are worth less unless the market rose in the interim (which no evidence supports). Although Judge James said that the price Excello received for its five-color presses is immaterial, 83 B.R. at 543, he gave no reasons and it is hard to see what they might be. Other things equal, five-color presses are worth more than four-color presses; no evidence suggests that the five-color presses were in worse shape. Excello had placed a greater value on its presses than on Metlife's in its bankruptcy schedules. The bankruptcy judge did not discuss why Excello's presses might have fetched less at what he presumed was a commercially reasonable auction than Metlife obtained from its private sale. Metlife knew in advance that its recovery was capped, which gave it every reason to conduct a commercially reasonable sale. Judge James did not mention this. There was also no explanation how Metlife could have been expected to receive $700,000 more than it did for the presses; all it had to do was show that the market value was less than $1.8 million to be entitled to a $900,000 deficiency judgment, and there is no evidence that the presses were worth anything near that.

## III

To summarize, the main question in a deficiency action is the commercial reasonableness of the disposition of the collateral, with the secured party bearing the burden of persuasion. Oral notification producing actual knowledge is "notice". If the debtor did not receive notice, the court may use the omission (along with other factors) to inform its assessment of commercial reasonableness. Only if the secured party cannot establish the commercial reasonableness of its sale need it try to prove market value using secondary evidence, such as appraisals and sales of similar equipment. Because the bankruptcy and district judges cut short these inquiries, the judgment is reversed, and the case is remanded to the bankruptcy court for proceedings consistent with this opinion.

RIPPLE, Circuit Judge, dissenting.

This case is indeed a difficult one and the majority's opinion reflects the careful attention that my brothers have given to this multifaceted problem. My own study and reflection has brought me to the conclusion that our colleague in the district court correctly decided the issues necessarily before him and, consequently, that the judgment ought to be affirmed.

### A.

With respect to the adequacy of notice of the sale of the collateral, there is, as my brothers note, a conflict of authority as to whether U.C.C. § 9–504(3) requires written notification to the debtor or whether oral notification is sufficient. However, this issue need not be decided in this case. Even assuming that New York does not require written notification under section 9–504(3), the district court determined that Metlife did not provide adequate oral notification. *In re Excello Press, Inc.*, 90 B.R. 335, 338 (N.D.Ill.1988). This determination of a mixed question of law and fact is subject to our review under a deferential standard.

*See Shacket v. Philko Aviation, Inc.*, 841 F.2d 166, 170 (7th Cir.1988) (trial court's determination that defendant had actual notice of prior interest in goods was not clearly erroneous); *see also Yockey v. Horn*, 880 F.2d 945, 949 n. 6 (7th Cir.1989) (clearly erroneous standard of review is employed for mixed questions of law and fact). The purpose of the notice requirement is not in serious dispute; it is designed "to give the debtor an opportunity to protect his interest in the collateral by exercising any right of redemption or by bidding at the sale, to challenge any aspect of the disposition before it is made, or to interest potential purchasers in the sale, all to the end that the merchandise not be sacrificed by sale at less than its true value" (citations omitted). *First Bank & Trust Co. of Ithaca v. Mitchell*, 123 Misc.2d 386, 473 N.Y.S.2d 697, 702 (Sup.Ct. 1984). The district court's assessment of the record in light of that purpose certainly is not clearly erroneous.[1] Metlife acquired legal authority to sell the presses on April 4, 1986. Between that date and April 23rd, the date the first press was sold, Excello knew little more than that Metlife planned to sell the presses in a private sale and that the presses "should" be sold by April 30, 1986. Excello had to vacate its premises on that date, and there were tremendous costs involved with moving the presses if they had not yet been sold. According to Metlife, deinstallation of the presses "would cause a decline in value of at least $100,000 per unit." R.72 at 296. However, the April 30, 1986 deadline, while important, was apparently not essential. One of the presses was sold on April 23 for $550,000; the other was not sold until June and was also purchased for $550,000. R.71 at 79; R.72 325–26.

### B.

Having determined that Metlife did not give Excello adequate notice of the sale of the presses, our focus must shift to the

---

1. Contrary to the majority's determination that the district court's decision flowed "not from the facts but from its assumption that New York would follow *Spillers*," majority op. at 903, it is clear that the court considered the evidence of record in making its determination, and did not rely solely on the *Spillers* case. *See* 90 B.R. at 338–39.

**908**

effect of that failure.[2] There is some authority in New York for the proposition that inadequate notice bars any deficiency judgment. However, most courts, including many in New York, have taken the view that inadequate notice simply creates "a presumption that the security was equal to the debt and that the secured party has the burden of proof to overcome such presumption...." *Security Trust Co. v. Thomas*, 59 A.D.2d 242, 399 N.Y.S.2d 511, 513 (1977). While I agree with the majority that it appears that New York would follow the latter line of cases if its Court of Appeals were confronted directly with the issue, I do not believe that we need to resolve definitively the issue in this litigation. If inadequate notice is deemed an absolute bar to a default judgment, Metlife's deficiency claim must fail. If New York rejects the absolute bar rule, on the other hand, Metlife must overcome the presumption that the value of the presses equalled the amount of Excello's debt ($2.7 million). Assuming the rebuttable presumption rule is the rule in the State of New York, I agree with the bankruptcy and district courts that the presumption was not overcome. *See* 83 B.R. at 543; 90 B.R. at 339–40.

Metlife argues that it was error for the bankruptcy court to determine, in the absence of contradictory evidence from Excello, that Metlife failed to rebut the presumption. However, the bankruptcy court sat as the trier of fact, and was entitled to disregard incredible or incompetent testimony. It was also entitled to assign different weight to the various submissions before it. It is clear that the bankruptcy court had legitimate reasons as the factfinder for rejecting Metlife's evidence. *See* 83 B.R. at 543; 90 B.R. at 340. For example, Metlife failed to produce any evidence of the fair market value of the presses at the *time of sale.* 83 B.R. at 543 (emphasis supplied). All of Metlife's evidence on this issue pertained to evaluation of the presses at some time other than the time of sale (most of the evidence was at least a year old). *Id.* The bankruptcy judge, as factfinder, merely weighed the credibility and probative value of Metlife's evidence. This court must defer to the trial court, particularly with respect to findings based on the bankruptcy court's assessment of witnesses' credibility. *Torres v. Wis. Dept. of Health and Soc. Servs.*, 838 F.2d 944, 946 (7th Cir.1988). Because I do not believe it was clearly erroneous for that court to find that Metlife failed to sustain its burden of proof, I would affirm the district court's decision.

## C.

In sum, I believe it is unnecessary to resolve the issues of New York law. We need not determine whether New York requires written, instead of oral, notice under section 9–504(3) because neither was given. Similarly, we need not determine whether inadequate notice absolutely bars a deficiency judgment or, alternatively, gives rise to a rebuttable presumption that the

---

2. Contrary to the majority's position, whether the sale was commercially reasonable is not always "the main question in a deficiency action." Majority op. at 907. As the court noted in *Security Trust Co. v. Thomas*, 59 A.D.2d 242, 399 N.Y.S.2d 511 (1977), the issue of commercial reasonableness is moot once the creditor fails to establish due notice. To succeed in a deficiency claim, a secured creditor must prove due notice of sale *and* commercial reasonableness. Having failed to prove one, the other becomes irrelevant and the creditor moves on to the next step—proof of the amount of the debt, the fair value of the collateral, and the resulting deficiency. *Id.* 399 N.Y.S.2d at 514. In this second part of the analysis, I cannot agree with the majority's position that "[t]he price obtained in a commercially reasonable sale is not *evidence* of the market value ... [i]t *is* the market value." Majority op. at 904–05 (emphasis in original). The majority offers no authority to support this position, and Metlife's own witnesses testified that the manner in which collateral is sold affects the price it will bring. R.70 at 62; R.73 at 34. For example, the price obtained at auction is usually diminished or liquidated. *Id.* The sales price does not necessarily reflect the market value, therefore, even though the sale is conducted in a commercially reasonable manner. Indeed, the majority's view is a clear invitation to a creditor to ignore the notice requirements of section 9–504(3). Under the majority's view, a secured creditor could hold a sale without appropriate notice, dispose of secured collateral, and still be able to recover a deficiency judgment so long as the creditor could prove the fair market value of the equipment sold.

value of the collateral equals the amount of the debt. Our only necessary task is to assess the determinations that Metlife failed to produce sufficient evidence of either adequate oral notification or of the collateral's market value in April and June, 1986. In my view, the structural relationship between trial and appellate courts—and the consequent deferential standard of review of the issues necessarily before us—requires that the judgment of the district court be affirmed.

Accordingly, I respectfully dissent.