In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2306

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

CHRISTOPHER C. BUCHMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 08-C-0483—**William C. Griesbach**, *Judge*.

ARGUED APRIL 5, 2011—DECIDED MAY 16, 2011

Before EASTERBROOK, *Chief Judge*, BAUER, *Circuit Judge*,
and YOUNG, *District Judge*.[1]

EASTERBROOK, *Chief Judge*. Christopher Buchman de-
faulted on debts to the Department of Agriculture's
Farm Service Agency. After the United States filed suit
to foreclose the mortgages on land that secured his
notes, Buchman negotiated with lawyers representing the

---

[1] Of the Southern District of Indiana, sitting by designation.

United States. When agreement could not be reached and time came for a formal answer to the complaint, Buchman offered none. A default judgment was entered in April 2009, ten months after the suit began. The day before the property was to be sold at auction, Buchman filed a petition in bankruptcy. That bought him more time—but his lack of a plan to pay these secured debts led the bankruptcy judge to lift the automatic stay and allow the sale to proceed. At a public auction in April 2010, the three parcels fetched a total of $322,000, not enough to repay all of Buchman's debts. (A bank also had loaned money on the security of these parcels. The bank has been repaid and need not be mentioned again.)

Contending that the price was inadequate, Buchman asked the judge to set the sale aside. The judge denied that motion, ruling that the outcome of a competitive auction is the best indicator of value. The judge also denied Buchman's request for an opportunity to redeem the parcels, observing that he had waited too long. The judgment of foreclosure in April 2009 did not provide for redemption, yet Buchman did not request an opportunity until after the property has been sold a year later. Moreover, the judge remarked, the litigation had been pending for two years, which afforded Buchman ample opportunity to pay his creditors and retain his property. He did not do so, and the judge concluded that he is not entitled to more time. The judge confirmed the sale and entered a deficiency judgment for the unpaid portion of the loans (plus interest).

Buchman did not ask either the district court or this court to stay the transfer of the property to the winning

bidders at the sale. The United States contends that the case therefore is moot. We grant that it is too late to direct the buyers to return the property. The court might have the raw power to do this, but only if the buyers were added as parties to the litigation, a step that Buchman has not taken. Even if the buyers had become parties, undoing commercial transactions cannot assist borrowers. If buyers believe that the parcels they acquire at auction can be snatched back whenever they have made a good deal, they will pay less at foreclosure sales—and borrowers such as Buchman will be worse off as a result. No buyer wants to lose profitable transactions while being saddled with unprofitable ones (because, if the bidder overpays, the borrower will not try to upset the sale); fear of such an asymmetric outcome would lead to lower prices in all sales. Thus we hold, following established doctrine, that a completed sale will not be upset. See *Duncan v. Farm Credit Bank of St. Louis*, 940 F.2d 1099, 1102 & n.4 (7th Cir. 1991) (foreclosure); *FDIC v. Meyer*, 781 F.2d 1260, 1263 (7th Cir. 1986) (same); *Hower v. Molding Systems Engineering Corp.*, 445 F.3d 935 (7th Cir. 2006) (bankruptcy auction); *In re Vlasek*, 325 F.3d 955, 962 (7th Cir. 2003) (same).

This does not imply, however, that the litigation is moot. A case or controversy ceases to exist only when there is nothing that the judiciary can do. To say that winning bidders at an auction are entitled to keep the property is not to say that nothing more is at stake. The United States received a deficiency judgment, which could be vacated. Indeed, we could order the United States to hand over to Buchman some or all of the

proceeds from the auction. The argument that a completed sale ends the litigation, even if other relief would be possible, is redolent of "equitable mootness" in bankruptcy law. Circuits that use that doctrine dismiss an appeal once a bankruptcy auction has been completed or a plan of reorganization confirmed and implemented without a stay. But this circuit does not follow that approach. We have held that the possibility of financial adjustments among the parties keeps a proceeding alive even if the sale cannot be upset and rights under a plan of reorganization cannot be revised. See *In re UNR Industries, Inc.*, 20 F.3d 766 (7th Cir. 1994). Likewise with foreclosure sales. The buyers' interests are secure, but the entitlements of Buchman *vis-à-vis* the United States remain open to change following appellate review.

Buchman contends that the judgment is erroneous because it does not afford him an opportunity to redeem the property. According to Buchman, who relies on *United States v. Einum*, 992 F.2d 761 (7th Cir. 1993), a borrower is entitled to a window for redemption unless the federal lender or guarantor offered a workout plan after the default—and the record does not establish whether such an opportunity was extended. The reason *why* the record is silent is that Buchman did not answer the complaint, and a default judgment was entered. He waited more than a year after that judgment to protest. Delay led the district judge to reject Buchman's argument without reaching the merits. Buchman's appellate brief ignores the ground on which he lost and proceeds directly to the merits. Such a head-in-sand approach cannot prevail. The district court did not abuse

its discretion in treating this contention as forfeited by delay.

The only argument preserved for appellate review is Buchman's contention that the sale price was too low. He tendered appraisals estimating that the parcels' market value was $513,000, substantially more than the $322,000 realized from the auction. Buchman did not, however, contend that there was anything wrong with the auction. It was advertised and well attended; the bidding was competitive. The district judge thought competition superior to appraisals as a means of establishing market value: an auction yields a real price, while appraisals are just forecasts. See *In re Excello Press, Inc.*, 890 F.2d 895, 905 (7th Cir. 1989). Appraisers often produce estimates that favor their employers' interests, so Buchman's appraisals might well be on the high side. And appraisers usually generate estimates by examining sales of comparable properties. When the market is down, as the real estate market has been for several years, appraisals based on pre-decline transactions do not produce reliable estimates of current market value.

The United States agrees with Buchman that Wisconsin law supplies the rule for determining whether the price at a foreclosure sale is too low to allow confirmation. See *United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979). Wisconsin requires the confirmation of a procedurally adequate sale unless the price is so low as to "shock the conscience" of the court. *Bank of New York v. Mills*, 270 Wis. 2d 790, 799, 678 N.W.2d 332, 336 (Ct. App. 2004). A plastic standard of this kind implies deferential appel-

late review. Buchman has not established that the district judge committed a clear error, or abused his discretion, by not displaying a shocked conscience.

Instead of engaging either Wisconsin's substantive standard or the limits of appellate review, Buchman wants us to assume that, as a matter of law, foreclosure sales produce inadequate prices because they lack a willing seller. Yet Wisconsin has not adopted such a presumption—and for good reason. As long as the auction is competitive, the price will be accurate whether or not the seller has veto power. See Jeremy Bulow & Paul Klemperer, *Why Do Sellers (Usually) Prefer Auctions?*, 99 Am. Econ. Rev. 1544 (2009); Paul Klemperer, *What Really Matters in Auction Design?*, 16 J. Econ. Perspectives 169 (Winter 2002); Robert G. Hansen & Randall S. Thomas, *Auctions in Bankruptcy: Theoretical Analysis and Practical Guidance*, 18 International Rev. L. & Econ. 159 (1998). Self-interested action drives the price to true value. If these parcels really were worth more than $500,000, then the unsuccessful bidders were leaving money on the table. Instead of allowing the land to go for $322,000, another bidder could have offered $350,000 and left room for a handsome profit; someone else would have topped the $350,000 bid. That process would have continued until none of the (losing) bidders anticipated making a profit at a higher price.

What's more, if the property really were worth more than $322,000, Buchman himself should have bid. His problem, as counsel conceded at oral argument, was that banks were unwilling to loan Buchman the funds

he needed to enter the auction. This implies that persons other than the judge doubted the $513,000 appraisals. Buchman also was unwilling or unable to cover the down payment that potential lenders required, which suggests that even he was skeptical about his appraisers' estimates—and, if Buchman could not or would not put up even 10% of the property's value, he was hardly going to be able to redeem the parcels or repay any loans.

Lack of a willing seller could matter in two ways. First, the property's current owner could place an idiosyncratic value on the property. Land could be worth $500,000 to its owner and $400,000 to everyone else. The difference might be attributable to sentiment (perhaps the owner grew up there) or to the fact that the owner's skills enable him to make the land more productive than anyone else. Buchman does not make such an argument, however, and it is not relevant in a foreclosure sale. By agreeing to repay the loan or give up the land, a borrower surrenders arguments of this kind. A borrower can realize on any private value by buying at the foreclosure sale, but as we have observed already Buchman did not try to do this.

Second, there could be a problem of timing. Perhaps property should be held until a higher-valuing buyer can be located. This is normal in sales of real estate, paintings, or other assets, where reserve bids prevent a sale unless a minimum price has been met. An extended search may be required to achieve the asset's full value, because it takes time for news to reach the person who can make the best use of the asset, and so is

willing to make the highest bid. When assets are not fungible (as real estate is not), it is common for buyers to value the assets differently, so that a search for the highest-valuing potential buyer can make sense. See Partha Dasgupta & Eric Maskin, *Efficient Auctions*, 115 Q.J. Econ. 341 (2000); Jeremy Bulow & Paul Klemperer, *Auctions versus Negotiations*, 86 Am. Econ. Rev. 180 (1996). The fact that the initial buyer can resell the asset to a higher-valuing user, and therefore will bid more at the auction (because a prospect of a profitable resale is part of the property's value to every bidder), does not entirely pass that value back to the owner; the middleman is compensated for this service. Yet Buchman had two years to search for the highest-valuing buyer and apparently did not try. He was determined to hold on to the parcels, not to sell them at the best price. Even now, a year after the sale, Buchman has not identified anyone who would pay (or would have paid in April 2010), $1 more than the price obtained at the auction. The district court's order confirming the sale is not vulnerable on appeal.

AFFIRMED