**VAN DORN RETAIL MANAGEMENT, INC.**

v.

**JIM'S OXFORD SHOP, INC., et al.**

Civ. No. 90–452–JD.

United States District Court,
D. New Hampshire.

May 12, 1994.

---

Paul McEachern, Portsmouth, NH.

Richard V. Wiebusch, Manchester, NH.

Anne Marie Tanin, Boston, MA.

## OPINION

DiCLERICO, Chief Judge.

The plaintiff Van Dorn Retail Management, Inc. ("Van Dorn Retail") brought this action for recovery on a personal guaranty against the defendant Louis Georgopoulos. Georgopoulos was the president of the defendant Jim's Oxford Shop, Inc. ("Jim's" or "Retailer"). The court has jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332(a) (West 1993). After hearing evidence during a two-day bench trial, the court makes the following findings of fact and conclusions of law.[1]

### I. Background

In September 1987 Jim's, a New Hampshire corporation, and Rothschild entered into an agreement whereby Rothschild agreed to provide credit to Jim's, purchase

---

1. This hearing was the second part of a bifurcated trial. Following the first hearing, the court found that a guaranty executed by Georgopoulos in favor of Maurice L. Rothschild & Co. ("Rothschild") was supported by consideration. The consideration for the guaranty was Rothschild's extension of credit to the defendants pursuant to Rothschild's and Jim's September 14, 1987 agreement ("agreement"). The court also found that Georgopoulos's guaranty followed Rothschild's assignment of the agreement to Van Dorn Retail.

inventory on behalf of Jim's, and advise Jim's about conducting its retail business. Plaintiff's Exhibit 1; Joint Statement of Undisputed and Disputed Material Facts at ¶ 2. In return, Jim's agreed to pay Rothschild 7% of gross receipts from sales as a commission and additionally pay Rothschild 55% of gross receipts for the cost of the goods sold. *See* Plaintiff's Exhibit 1 at ¶¶ 7, 8. Jim's also agreed to grant Rothschild "a purchase money security interest in the Purchase Merchandise and such security interest shall continue in the proceeds thereof." *Id.* at ¶ 6. Purchase Merchandise is defined as merchandise delivered by Rothschild pursuant to the agreement. *Id.* at ¶ 4. The agreement further provides:

(a) As additional security, Retailer hereby grants to Rothschild a security interest pursuant to the laws of the state where the retail location(s), as set forth in Schedule A is (are) situated, in all inventory, accounts, receivables, fixtures, equipment, bank accounts, chattel paper, instruments, documents, goods, general intangibles, leaseholds, contract rights and all other assets of every kind and description, whether now owned or hereafter acquired and all additions and accessions to, and all proceeds (including insurance proceeds and tort claims) of any of the foregoing as security for:

(i) All fees, expenses and advances, guarantees and any other monies due Rothschild hereunder.

(ii) The cost of merchandise ordered for Retailer pursuant to the terms hereof.

*Id.* at ¶ 9. Schedule A lists the only location of Jim's as 4 Vinton Street, Manchester, New Hampshire 03103. *Id.* at Schedule A. By its terms, the agreement terminated on July 31, 1990. *Id.* at ¶ 1.

As consideration for the agreement, Georgopoulos signed a guaranty. Plaintiff's Exhibits 1-3. The guaranty executed by Georgopoulos provides in pertinent part:

the undersigned ... consents to the within Agreement and guarantees to Rothschild and its successors and assigns, the full performance and observance of all the covenants, conditions and agreements therein provided to be performed by Retailer, including, but not limited to, payment of all sums due Rothschild, when due, whether arising from the Agreement or from any advance or loan which Rothschild may make to Retailer.

*Id.* The guaranty further provides in pertinent part that "[i]n the event that Rothschild is required to retain an attorney to enforce its rights under this Guaranty, each of the undersigned agrees to pay all costs and expenses incurred by Rothschild, including reasonable attorneys' fees." *Id.*

On March 16, 1988, Rothschild assigned its rights under the agreement to Van Dorn Retail, a New York corporation and Georgopoulos as Jim's representative and as guarantor acknowledged and consented to the assignment in February 1988. Plaintiff's Exhibits 4, 5; Joint Statement of Undisputed and Disputed Material Facts at ¶¶ 1, 9–11. By a letter dated February 22, 1988, Van Dorn Retail agreed that in consideration for signing the consent to assignment, Van Dorn Retail would reduce its commission from 7% to 6%. Plaintiff's Exhibit 6. Van Dorn Retail and Jim's subsequently amended paragraph 5 of the agreement to provide:

In the event the amount due consultant exceeds the credit limit of $100,000.00, [sic] interest will be charged at the prime rate plus two per cent [sic] (2%) prorated on a daily basis payable on the 15th of each month for the preceding month, effective November 1, 1989.

Plaintiff's Exhibit 7.[2]

By a letter dated July 31, 1990, Van Dorn Retail notified Georgopoulos that the agree-

---

**2.** Paragraph 5 of the agreement originally provided in pertinent part:

At no time shall Rothschild be obligated to undertake commitments for Purchase Merchandise or have owing to it from Retailer (which debt shall include any amounts due for merchandise ordered but not yet delivered) a sum in excess of $100,000 by Retailer hereunder. However, should the indebtedness due Rothschild exceed $100,000, this event shall not in any way affect or impair any of Rothschild's rights under this Agreement or its ability to declare a default.
Plaintiff's Exhibit 1.

ment expired and that "[a]ll sums due are immediately due and payable." Plaintiff's Exhibit 9. The letter also provided that "[i]f full payment is not received within Five (5) days of receipt of this letter, then [Van Dorn Retail] will exercise all rights as a secured creditor under the terms of [Van Dorn Retail's and Jim's] agreement." Id.[3] The balance due was approximately $128,868.19 and the interest due on that amount through July 31, 1990 was $5230.40. Plaintiff's Exhibit 12.

The parties tried unsuccessfully to negotiate an agreement to conduct an amicable sale. Delbert Van Dorn ("Van Dorn"), president of Van Dorn Retail, was aware of only two occasions that Van Dorn Retail and a retailer were unable to agree to terms to conduct such a sale. When a retailer amicably agrees to allow Van Dorn Retail to conduct a sale, Van Dorn Retail provides the retailer with a guarantee or a percentage of the sale of goods that Van Dorn Retail brings into the store to supplement the retailer's inventory.

Because the relationship between the parties had deteriorated and an agreement could not be reached, Van Dorn Retail brought an action on October 5, 1990 requesting the court to grant Van Dorn Retail the right to full possession of Jim's and all the items in which Van Dorn Retail held a security interest. Complaint at ¶ A.[4] Van Dorn Retail sought an order so that it would be able to conduct a going out of business or other liquidating sale. Id.

In December 1990, Magistrate Barry conducted a hearing considering Van Dorn Retail's request to enforce paragraph 14 of its agreement with Jim's by exercising its right to take possession of Jim's inventory and to run a liquidation sale on Jim's premises. The magistrate noted that Van Dorn Retail sought preliminary injunctive relief under Fed.R.Civ.P. 65. In a report and recommendation dated December 28, 1990, Magistrate Barry recommended that Jim's "be ordered to turn over possession of its inventory to [Van Dorn Retail] and [Van Dorn Retail] be allowed to timely run a liquidation sale on the premises of [Jim's]." He further recommended that Van Dorn Retail be required to post a $200,000 bond.

3. The agreement provides for the remedy in the event that it terminates. Plaintiff's Exhibit 1 at ¶ 14. The agreement provides in pertinent part: Upon termination of this Agreement, all sums due [Van Dorn Retail] shall become immediately due and payable. Sums due [Van Dorn Retail] upon termination shall be all consultant's fees earned hereunder, the purchase price for all Purchase Merchandise, whether said merchandise is in Retailer's store or is as yet undelivered but for which [Van Dorn Retail] is obligated but has not yet been paid for by Retailer, and any [sic] [Van Dorn Retail]'s expenses, advances, or guarantees. In the event such monies are not paid to [Van Dorn Retail] upon termination, [Van Dorn Retail] shall have the right to take possession of such Purchase Merchandise and any other inventory of Retailer on which [Van Dorn Retail] has a security interest and liquidate such merchandise for the benefit of Retailer, which right shall include the right to run a "Going–Out–of–Business" sale or similar liquidating sale at the premises listed in Schedule A, and Retailer hereby grants to [Van Dorn Retail], without any payment, the right to occupy said premises for a reasonable period of time to conduct said Going–Out–of–Business or similar liquidating sale and agrees that [Van Dorn Retail] may, in Retailer's name, continue to pay any rent to landlord at Retailer's expense during such period.... [Van Dorn Retail] shall have the further right immediately to remove from Re-

tailer's premises the Purchase Merchandise and any other inventory of Retailer on which [Van Dorn Retail] has a security interest and sell same at public or private sale and [Van Dorn Retail] shall have the right to purchase at said sale in whole or in part. In addition, [Van Dorn Retail] shall have such rights as a creditor pursuant to the Uniform Commercial Code. Any surplus after payment in full to [Van Dorn Retail] of all sums due it including, but not limited to, commissions, expenses of said sale and reasonable attorneys' fees, shall be remitted to Retailer.
Id.

4. The defendants brought a counterclaim asserting that Van Dorn Retail had breached the agreement with Jim's by failing to render timely business advice to Jim's, to approve Jim's requests for merchandise in a timely manner, or to supply Jim's with merchandise Jim's ordered in a timely manner. Defendants' Answer, Set–Off and Counterclaim at ¶¶ 27–31, 33–34. The defendants also alleged Van Dorn Retail sent Jim's merchandise which the defendants never ordered and required them to sell this merchandise. Id. at ¶ 32. The defendants alleged that as a result of Van Dorn Retail's breach, they suffered damages. Id. at ¶¶ 35, 37–38. At trial, Georgopoulos abandoned this counterclaim. He stated that he did not want to incur any more legal expenses litigating the counterclaim.

The case was referred to Judge Lagueux of the United States District Court for the District of Rhode Island after the recusal of the then sitting New Hampshire District Court Judges. Judge Lagueux adopted Magistrate Barry's report and recommendation. His March 8, 1991 order provides:

Upon the posting of bond by the Plaintiff in the amount of $200,000.00, Defendants are ordered to turn over all inventory and other property in which Plaintiff has a security interest and surrender unrestricted, exclusive possession of the premises to the Plaintiff so that it may run a going out of business sale.

Pursuant to this order, Van Dorn Retail posted a $200,000 bond and sought to take possession of Jim's.

On Friday, March 8, 1991, Van Dorn gained possession of Jim's, changed the locks, and secured the building until the following Monday. According to Van Dorn, he and two of his employees conducted an inventory of Jim's over several days. *See* Plaintiff's Exhibit 28. He was unaware of any inventory being removed prior to the inventory being conducted. Georgopoulos was not permitted to assist in the inventory of Jim's. The sheets upon which they recorded the inventory provided categories for quantity of items, the total retail value of the items, the retail value of each item, and the cost value of each item. *Id.* Van Dorn found that Jim's inventory as of March 1991 was approximately $140,000. He was aware that at the December 1990 hearing before Magistrate Barry, the defendants represented that the value of the inventory of Jim's was $217,000.

There were some fixtures in the store including racks, display units, a few antiques, a cash register, a couch, and a vacuum cleaner. Van Dorn Retail hired an antique dealer to appraise some of the fixtures at Jim's including the antique cash register. It was Van Dorn's experience that fixtures usually sell for ten cents on the dollar. Van Dorn Retail corresponded with Georgopoulos concerning these fixtures and notified him that unless it received some documentary proof concerning ownership, Van Dorn Retail would sell the fixtures. Plaintiff's Exhibits 52, 54. Georgo-poulos never supplied documentary proof concerning ownership of any of Jim's fixtures. He admitted to removing a personal computer from Jim's prior to March 8, 1991, and also made contradictory statements concerning the ownership of the antique cash register. Joint Statement of Undisputed and Disputed Material Facts at ¶¶ 23–25.

According to Van Dorn, the results of the completed inventory were sent to Georgopoulos. Van Dorn Retail has not received any communication from Georgopoulos disputing any part of the inventory.

Van Dorn and his two employees also arranged for the sale by contacting and setting up accounts with the utilities, landlord, advertisers, and banks. Prior to and during the course of the sale, Van Dorn Retail supplemented or complimented the inventory of Jim's to offset costs of conducting the sale of Jim's inventory, to reduce any drastic markdowns on Jim's inventory, and to attract customers who might otherwise have been discouraged in finding that only certain sizes of merchandise were available at the sale.

Van Dorn Retail hired six workers locally and paid them between $6.00–$7.00 per hour. It also hired a consultant to supervise the sale. The two Van Dorn Retail employees who assisted in the inventory also worked during the sale. Van Dorn Retail paid expenses for the utilities, telephone, advertising and security. Plaintiff's Exhibits 32, 33. The sale was advertised regularly in the Manchester *Union Leader.* Joint Statement of Undisputed and Disputed Material Facts at ¶ 30; Plaintiff's Exhibit 31. The advertisements identified the event at Jim's as a foreclosure sale by order of the court and stated that Jim's entire inventory and fixtures were being liquidated. Plaintiff's Exhibit 31. Some of the advertisements provided that over $1,000,000 of merchandise was being sold at Jim's. *Id.* According to Van Dorn, the figure was calculated based on the total retail value of Jim's merchandise and the merchandise that Van Dorn Retail brought into Jim's during the sale. Van Dorn Retail provided a furnished apartment and car for the full-time manager and hotel rooms, meals and airfare for the other permanent employees. Joint Statement of Un-

disputed and Disputed Material Facts at ¶ 27. The sale ended on June 29, 1991 and Georgopoulos received written notice of this on July 1, 1991. *Id.* at ¶¶ 28, 29. Georgopoulos received the keys to Jim's from Van Dorn Retail's counsel.

## II. Claims:

Georgopoulos challenges both Van Dorn Retail's conducting of and accounting for the sale. Defendants' Pretrial Memorandum in Support of Claim at ¶ 14. In his view, Van Dorn Retail breached its duty of good faith and fair dealing by not allowing the defendants the opportunity to verify the inventory, by conducting a sale "under circumstances where no subsequent fact finder could reasonably attest to its verity," and by not offering the defendants a "guarantee on the imported merchandise as is customary in the business of the plaintiff." Defendants' Post Trial Memorandum at 6. He asserts that conducting a going out of business sale as provided for in the agreement is outside the purview of the Uniform Commercial Code ("U.C.C."). *Id.* at 5. He has also characterized the sale as a judicial sale subject to 28 U.S.C.A. § 2004 (West 1982). Proposed Findings of Fact and Conclusions of Law at ¶¶ 55–56, 61. According to Georgopoulos, the sale was Van Dorn Retail's exclusive remedy, Van Dorn Retail failed to make a claim for a deficiency, and no provision in the agreement entitles Van Dorn Retail to a commission on the sale of merchandise sold after the termination of the contract. Defendants' Post–Trial Memorandum. He further claims that Van Dorn Retail "maintained a going out of business sale" at Jim's and violated N.H.Rev.Stat.Ann. ("RSA") § 358–A:2, XII. Defendants' Pretrial Memorandum in Support of Claim at ¶ 12.

## III. Nature of Sale:

■ Pursuant to the agreement, Jim's granted to Van Dorn Retail a "security interest pursuant to the laws of the state where the retail location" is located. Plaintiff's Exhibit 1 at ¶ 9(a). Jim's was located in Manchester, New Hampshire and thus New Hampshire law applies.

■ When a debtor is in default under the terms of a security agreement, the secured party may elect to "reduce his claim to judgment, foreclose or otherwise enforce the security interest by any available judicial procedure." RSA § 382–A:9–501 (Supp. 1993); *Banker v. Upper Valley Refrigeration Co., Inc.,* 771 F.Supp. 6, 8 (D.N.H.1991). If the secured party forecloses on the collateral, the secured party can sell the collateral, RSA § 382–A:9–504(1) (Supp.1993), or "propose to retain the collateral in satisfaction of the obligation." RSA § 382–A:9–505(2) (Supp. 1993). Upon default, the secured party may take possession of the collateral "without judicial process if this can be done without breach of the peace or may proceed by action." RSA § 382–A:9–503 (Supp.1993). As defined by the U.C.C., an action "in the sense of a judicial proceeding includes recoupment, counterclaim, set-off, suit in equity and any other proceedings in which rights are determined." RSA § 382–A:1–201(1) (1961).

After the termination of the agreement, Van Dorn Retail sought to gain possession of its collateral at Jim's. Georgopoulos testified that between July 31, 1990, and March 8, 1991, Jim's may have sold property that was subject to the agreement. He also testified that the proceeds from any such sales were spent to replenish merchandise in the store. Jim's did not compensate Van Dorn Retail with the 6% commission provided for in the agreement and amendment to the agreement. The agreement as amended provides that in consideration for Van Dorn Retail's services, Jim's agrees to pay Van Dorn Retail 6% "of the gross receipts received from all sales of merchandise made at the premises listed in Schedule A *during the term of this Agreement and thereafter until all payments due [Van Dorn Retail] have been made.*" Plaintiff's Exhibit 1 at ¶ 7 (emphasis added); *see also* Plaintiff's Exhibit 6.

Unable to obtain possession peaceably and aware that the defendants were selling the collateral, Van Dorn Retail proceeded to court. While Georgopoulos characterizes the proceedings as a judicial sale, Magistrate Barry specifically noted that Van Dorn Retail was seeking preliminary injunctive relief.

Similarly, Judge Lagueux's order granted Van Dorn Retail exclusive possession of Jim's to enable them to conduct a sale. The agreement itself specifically provided that Van Dorn Retail could seek equitable remedies including injunctive relief. Plaintiff's Exhibit 1 at ¶ 23. Although neither Magistrate Barry nor Judge Lagueux specifically referred it in their decisions, Paragraph 23 of the agreement provides:

> [Van Dorn Retail] may secure the enforcement of all commitments made herein by Retailer by proceedings at law or in equity to restrain violations or to recover damages or to compel performance against any person or persons violating or attempting to violate this Agreement. Included in the remedies afforded to [Van Dorn Retail] shall be the right to apply to any court of appropriate jurisdiction for a specific performance of the terms hereof and/or injunctive relief. [Van Dorn Retail] shall not be required to post bond at any proceeding.

*Id.*

The court finds and rules that no judicial sale occurred. Van Dorn Retail responded to defendants' selling of the collateral that was subject to a security interest and sought the aid of the court to gain possession of Jim's to enable Van Dorn Retail to conduct a sale according to its rights under the agreement and the U.C.C.

Despite Judge Lagueux's statement that Van Dorn Retail may run a "going out of business sale," the court also finds and rules that the sale was not a going out of business sale. In its complaint, Van Dorn Retail sought to obtain possession of Jim's so that it could run a "going out of business or other liquidating sale" and at a hearing Magistrate Barry recommended that Van Dorn Retail be permitted to run a liquidation sale. The advertisements in the Manchester *Union Leader* do not refer to a going out of business sale but rather a foreclosure sale by order of the court liquidating Jim's. Plaintiff's Exhibit 31. Therefore, the claim that Van Dorn Retail "maintained a going out of

business sale" at Jim's and violated RSA § 358–A:2, XII is without merit.

■ Van Dorn Retail elected to sell the collateral and § 9–504 of the U.C.C. therefore governs the disposition of the collateral that occurred here. It provides:

> (1) A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. Any sale of goods is subject to the Article on Sales (Article 2). The proceeds of disposition shall be applied in the order following to
>
>> (a) the reasonable expenses of retaking, holding, preparing for sale, selling and the like and, to the extent provided for in the agreement and not prohibited by law, the reasonable attorneys' fees and legal expenses incurred by the secured party;
>>
>> (b) the satisfaction of indebtedness secured by the security interest under which the disposition is made.

RSA § 382–A:9–504(1).[5] Section 9–504 also provides that "[i]f the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, *unless otherwise agreed, the debtor is liable for any deficiency.*" RSA § 382–A:9–504(2) (emphasis added). Van Dorn Retail has not discharged the defendants from any deficiency in the agreement. Van Dorn Retail was not required specifically to request a deficiency since by law the defendants are liable for any deficiency unless otherwise agreed to.

## IV. Commercial Reasonableness of Sale

■ A secured party seeking a deficiency judgment has the burden of establishing that it disposed of the collateral in a commercially reasonable manner. *See, e.g., Shawmut Worcester County Bank, N.A. v. Miller,* 398 Mass. 273, 496 N.E.2d 625, 630–31 (1986); *Mack Fin. Corp. v. Knoud,* 98 A.D.2d 713, 469 N.Y.S.2d 116, 117 (2d Dep't 1983); *Kohler v. Ford Motor Credit Co., Inc.,* 93 A.D.2d

---

**5.** As discussed *infra,* the agreement provides Van Dorn Retail with the right to collect reasonable attorneys' fees. Plaintiff's Exhibit 1 at ¶ 14.

205, 462 N.Y.S.2d 297, 299 (3d Dep't 1983); *General Elec. Credit Corp. v. Durante Bros. & Sons, Inc.*, 79 A.D.2d 509, 433 N.Y.S.2d 574, 576 (1st Dep't 1980); *see also Chemical Bank v. Haseotes*, No. 93 Civ 2846, 1994 WL 30476, at *3–4, 1994 U.S.Dist. LEXIS 859, at *11–12 (S.D.N.Y. Feb. 1994); *Food Assoc., Inc. v. Capital Assoc., Inc.*, 491 So.2d 345, 346 (Fla.Dist.Ct.App. 4th Dist.1986). The U.C.C. does not specifically define the phrase "commercially reasonable". *Bezanson v. Fleet Bank*, No. 90–118–B, slip op. at 12 (D.N.H. Aug. 27, 1993); *In re Zsa Zsa Ltd.*, 352 F.Supp. 665, 669–70 (S.D.N.Y.1972), *aff'd*, 475 F.2d 1393 (1973). The U.C.C. does provide some guidance by requiring that the "method, manner, time, place and terms" of the disposition be commercially reasonable. RSA § 382–A:9–504(3). Section 9–504(3) permits the disposition of the collateral to occur by public or private sale and by unit or parcel. *Id.* Section 9–507 further provides guidance in interpreting commercial reasonableness and reads in pertinent part:

> (2) The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the secured party is not of itself sufficient to establish that the sale was not made in a commercially reasonable manner. If the secured party either sells the collateral in the usual manner in any recognized market therefor or if he sells at the price current in such market at the time of his sale or if he has otherwise sold in conformity with reasonable commercial practices among dealers in the type of property sold he has sold in a commercially reasonable manner.

RSA § 382–A:9–507(2). "Although the New Hampshire Supreme Court has not addressed this issue, the view that commercial reasonableness can only be determined upon a consideration of all the surrounding circumstances is consistent with the meaning that other jurisdictions have given the term." *Bezanson*, No. 90–118–B, slip op. at 12 (citing *In re Zsa Zsa Ltd.*, 352 F.Supp. at 670 ("It is

the aggregate of circumstances in each case—rather than the specific details of the sale taken in isolation—that should be emphasized in review of a sale.")); *see also First Nat'l Bank v. G.F. Clear, Inc.*, 93 A.D.2d 925, 462 N.Y.S.2d 327, 329 (3d Dep't 1983) ("consideration must be given to the totality of the circumstances surrounding the entire proceedings, rather than an isolated portion thereof").

## A. Inventory of Jim's

At trial, Georgopoulos challenged the method of inventorying used by Van Dorn Retail after it gained possession of Jim's. While Georgopoulos questions the inventory practices, he was unable to produce any records demonstrating the true value of the inventory. During the hearing Georgopoulos testified he had previously participated in inventories at Jim's. He stated that the last time he participated in a complete inventory of Jim's was in 1989 or 1990 and described the process he employed. He also testified that his computer kept track of inventory in the store, but was unable to produce any computer printouts documenting the value of the merchandise at a time contemporaneous with Van Dorn Retail gaining possession of Jim's. Georgopoulos also complained that he was not permitted to participate in the inventory or sale conducted by Van Dorn Retail. However, neither the agreement nor Judge Lagueux's order provided that Georgopoulos or his representatives had the right to be present during the inventory or during the sale.[6]

Van Dorn testified that he has over twenty years' experience, has familiarity with the merchandise and has been involved in approximately 100 sales conducted on the premises of a retailer after a retailer defaults on its obligations. He explained the method he and his employees used in inventorying Jim's. They recorded the quantity of items and their value at retail and at cost. Plaintiff's Exhibit 28. While his method of inventory varies from that used by Georgopoulos,

6. Since the parties were at odds with each other shortly after their agreement terminated, it is unfortunate that neither the parties nor counsel saw fit to agree to the presence of a disinterested third party during the inventory to avoid any dispute over the amount of inventory. Nonetheless, the court is satisfied from the evidence presented that Van Dorn conducted an accurate inventory.

this fact alone does not make Van Dorn's method commercially unreasonable. Van Dorn also hired an antique appraiser to determine the value of some of the fixtures in Jim's. In light of Van Dorn's experience in conducting inventories, Van Dorn Retail's reliance on an appraisal of the fixtures, and the documentation of the process, the court finds that the inventory was conducted in a commercially reasonable manner.

## B. The Sale:

■ According to Van Dorn, the purpose of the sale was to convert collateral into cash to reduce Jim's debt to Van Dorn Retail. Van Dorn testified that in his experience of conducting sales, more money can be gained by selling the retailer's merchandise on the retailer's premises rather than incurring expenses in transporting the merchandise to another facility. He estimated that Van Dorn Retail customarily receives 50–60% more by selling the property at the retailer's premises. In addition, to maximize the return on Jim's merchandise and offset the costs of conducting the sale, Van Dorn Retail supplemented the inventory. This complimenting of the inventory may have attracted customers who might otherwise have been discouraged by the lack of certain sizes. Van Dorn testified that he regularly supplements a retailer's inventory when running a sale. When conducting the sale, Van Dorn Retail kept track of the sale of merchandise which it brought in and the sale of Jim's inventory.

Other relevant factors courts examine to determine the commercial reasonableness of the sale are the timing of the sale, the secured party's good faith, the experience of those conducting the sale, the methods of publicizing the sale, and the price received. See generally Bezanson, No. 90–118–B, slip op. at 13; In re Zsa Zsa Ltd., 352 F.Supp. at 668, 670–71; First Bank and Trust Co. v. Mitchell, 123 Misc.2d 386, 473 N.Y.S.2d 697, 702–703 (Sup.Ct.1984). Van Dorn Retail did not delay in conducting the sale. It took possession of Jim's on March 8, 1991, conducted an inventory of the store, prepared the store for the sale and began the sale nine days later. The expenses of the sale were not excessive. To keep the expenses down, Van Dorn hired locally and did not pay benefits. Van Dorn has extensive experience in running sales after a retailer defaults on its obligations. He personally has been involved in approximately 100 of such sales. Van Dorn testified that in his opinion the sale was conducted in a commercially reasonable manner.

The sale was regularly advertised in the Manchester *Union Leader,* the principal newspaper for the city of Manchester and the state of New Hampshire. *See* Joint Statement of Undisputed and Disputed Material Facts at ¶ 30; Plaintiff's Exhibit 31. These advertisements described the merchandise to be sold, the time and dates of the sale and the methods of payment accepted. Plaintiff's Exhibit 31. The advertising employed by Van Dorn Retail is unlike that used by the plaintiff in *First Bank and Trust Co.* where the court noted that advertising an auction outside of those cities surrounding Ithaca, New York such as Syracuse or Binghamton would have drawn additional bidders. 473 N.Y.S.2d at 702–703; *see also General Elec. Credit Corp.,* 433 N.Y.S.2d at 576 ("newspaper selected for advertising was clearly not the most appropriate one for reaching the intended market").

After inventorying Jim's, Van Dorn Retail determined that the value of Jim's merchandise was $140,000 at cost. *See First Bank and Trust Co.,* 473 N.Y.S.2d at 703 (recognizing that the "use of cost has been accepted as a guide in evaluating the commercial reasonableness of a sale of collateral.") In turn, this merchandise was sold for $142,762.73, a price exceeding the cost value of the merchandise. Taking into account the totality of the circumstances, the court finds that Van Dorn Retail's sale of Jim's merchandise was commercially reasonable.

## V. Reasonable Notification:

■ The U.C.C. also requires that a secured party provide a debtor with reasonable notification of the sale. RSA § 382–A:9–504(3). Section 9–504(3) provides in pertinent part:

Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market,

reasonable notification of the time and place of any public sale ... shall be sent by the secured party to the debtor....

*Id.* A majority of jurisdictions have considered guarantors to be debtors as defined by Article 9 and as such, entitled to notice of the sale. *Shawmut Worcester County Bank, N.A.,* 496 N.E.2d at 628 n. 5; *see First Bank and Trust Co.,* 473 N.Y.S.2d at 700; *Chase Manhattan Bank, N.A. v. Natarelli,* 93 Misc.2d 78, 401 N.Y.S.2d 404, 412 (Sup.Ct. 1977). While the term "sent" implies a mailing, "all it actually requires is actual or constructive receipt of notice. UCC § 1–201(25) provides that a person has notice when he has actual knowledge, when he receives notification or when 'from all the facts and circumstances known to him at the time in question he has reason to know that it exists.'" *Chase Manhattan Bank, N.A.,* 401 N.Y.S.2d at 412 (citation omitted); *see also First Bank and Trust Co.,* 473 N.Y.S.2d at 701 ("Oral notice which gives actual notice is sufficient to comply with the requirement that notice be 'sent.'"); *see generally In re Excello Press, Inc.,* 890 F.2d 896 (7th Cir. 1989) (applying New York law and discussing use of the term "send" as used in Article 9).

Georgopoulos has not disputed that he had notice of the sale. He testified that he had heard about the first day of the sale and even telephoned Van Dorn the following day congratulating him on the sales' success. The time and place of the sale were advertised in the Manchester *Union Leader.* The court finds Georgopoulos had notice of the sale.

## VI. Determination of the Amount of Debt and Deficiency

Having determined that the sale was conducted in a commercially reasonable manner, the court must next establish the amount of the debt. Van Dorn Retail alleges that the debt as of the date it took possession of Jim's, March 8, 1991, was $156,313.33. Motion to Amend Damage Calculation at 2, Exhibit A at 28.[7] Plaintiff's Exhibit 68 reflects that as of January 1, 1991, the debt,

exclusive of interest, credits, Van Dorn's and another employee's expenses, and attorneys' fees was $148,537.70. *See also* Plaintiff's Exhibit 32 at 6. Taking into account interest, debits and expenses through February 1991, Plaintiff's Exhibit 68 reveals that the debt was $159,412.62. When credits through February 1991 are subtracted from that figure, the debt as of the date of sale is $135,555.74. *See* Plaintiff's Exhibit 68. The court finds the debt as of March 8, 1991, was $135,-555.74.

The court makes the following additional findings. Van Dorn Retail's accounting of sale reflects that it realized a total of $149,-541.53 for Jim's fixtures and merchandise: $6778.80 from the sale of Jim's fixtures and $142,762.73 from the sale of Jim's merchandise. Plaintiff's Exhibit 32. The amount realized from the sale of Van Dorn Retail's merchandise was $291,423.88. *Id.* The total receipts for both Jim's merchandise and fixtures and Van Dorn Retail's merchandise was $440,965.41. *Id.* The expenses of the sale were $133,599.24. *Id.* Van Dorn Retail equitably apportioned the expenses of running the sale in accordance with the amount of merchandise sold and determined the defendants' share was 33.91% or $45,303.50. *Id.; see also* Plaintiff's Exhibit 68 at 2. Van Dorn Retail also demonstrated that it was entitled to (1) commissions in the amount of $6512.90 for merchandise sold by Jim's prior to the sale, (2) commissions in the amount of $8453.78 for merchandise sold during the sale and (3) reimbursement in the amount of $1812.33 for Van Dorn's expenses during the sale. Van Dorn Retail's damage calculation of the amount sold did not include a $17,-857.72 credit for the value of merchandise and fixtures sold prior to the deduction of Van Dorn Retail's 6% commission. Motion to Amend Damage Calculation at 1, 3 n. 6. Taking into account the foregoing amounts, the court finds that Van Dorn Retail realized $105,316.74 from the sale to be applied against the debt of $135,555.74. The deficiency on the debt as of the end of July 1991 was $30,239. As provided for in the agree-

---

7. This exhibit to the motion was also offered for identification at trial, but was not a full exhibit. It purports to describe the interest on accounts receivable. Exclusive of attorneys' fees, but inclusive of a credit of $668.53, the debt was approximately $135,000 as of March 8, 1991.

ment, Van Dorn Retail is entitled to interest for the period during the sale when the debt exclusive of attorneys' fees exceeded $100,-000. *See* Plaintiff's Exhibit 7. The court finds that the debt exceeded $100,000 from March 8, 1991 through April 9, 1991. *See* Plaintiff's Exhibit 68.

*VII. Reasonableness of Attorneys' Fees*

■ Van Dorn Retail alleges it is entitled to reasonable attorneys' fees and disbursements pursuant to the agreement and Georgopoulos' guaranty. *See* Plaintiff's Exhibits 1–3. During the trial it submitted a summary of its legal fees and costs. Plaintiff's Exhibit 71. After trial, Van Dorn Retail submitted a memorandum in support of its claim for attorneys' fees and costs accompanied by an affidavit of counsel explaining the hourly rates of attorneys, paralegals, a law clerk and a graphic artist and by detailed bills of disbursements made and of the services rendered by various attorneys, time spent in rendering these services and the date of the services. Van Dorn Retail alleges that since counsel "became involved with this controversy in or about September, 1990, through February 22, 1994, a total of eight attorneys, three paralegals, one law clerk and one graphic artist have devoted a total of *809.2 hours* to the case." Affidavit of Rich-

ard V. Wiebusch in Support of Van Dorn Retail Management, Inc.'s Damage Claim for Attorneys['] Fees and Costs ("Wiebusch Affidavit") at ¶ 7. Wiebusch summarizes the services his firm provided to Van Dorn Retail including taking depositions, serving interrogatories, responding to discovery requests, drafting pleadings, researching and preparing for trial. *Id.* at ¶ 6. Van Dorn Retail was also forced to litigate its rights before Magistrate Barry, Judge Lagueux and this court. *Id.* The total attorneys' fees sought by Van Dorn Retail through January 31, 1994 are $108,987.50 and the total disbursements by counsel are $9,803.35. *Id.* at ¶ 8.[8]

According to Van Dorn Retail, Georgopoulos' actions precipitated the need to expend resources on attorneys' fees. Van Dorn Retail faced many obstacles in trying to dispose of its collateral. Although the agreement specifically granted Van Dorn Retail the right to take possession of the collateral and conduct a going out of business or other liquidating sale, Van Dorn Retail asserts Georgopoulos refused to turn over possession of the collateral and sold some of the collateral. By his own admission Georgopoulos sold some merchandise that was subject to the agreement and did not account to Van Dorn Retail for its commission on the sales. Georgopoulos challenges the attorneys' fees

---

*See* Motion to Amend Damage Calculation, Exhibit A.

8. According to Wiebusch, the following are the total number of hours worked by each attorney, paralegal, law clerk, and graphic artist and their hourly rates:

| | Total Hours: | Rate: |
|---|---|---|
| A. Attorneys | | |
| 1. Richard V. Wiebusch | 179.4 | $235–95 |
| 2. Anne Marie Tanin | 290.8 | $100–55 |
| 3. W. Scott O'Connell | 49.10 | $135–40 |
| 4. Michael Zullas | 16.7 | $165 |
| 5. Lisa Newlin | 2.4 | $105 |
| 6. Donald Williamson | .70 | $150 |
| 7. Donna Smith | .50 | $215 |
| 8. Jane Pickrell | .10 | $190 |
| | | |
| B. Paralegals | | |
| 1. Marlene Jordan | 221.9 | $70–80 |
| 2. Terry Baldwin | 3.6 | $75–80 |
| 3. Pamela Drew | 3.2 | $75 |
| | | |
| C. Law Clerk | | |
| 1. Michelle Brownlee | 21.0 | $75 |
| | | |
| D. Graphic Artist | | |
| 1. Robert MacIntosh | 19.8 | $125 |

Wiebusch Affidavit at ¶ 9.

requested by Van Dorn Retail as unreasonable.

Under the terms of the agreement, Van Dorn Retail is entitled to collect reasonable attorneys' fees. Plaintiff's Exhibit 1, ¶ 14. The agreement provides that "Retailer shall pay any and all expenses of [Van Dorn Retail] (other than attorneys [sic] fees incurred in the preparation of this Agreement), which expenses are attributable to the enforcement of this Agreement." Plaintiff's Exhibit 1 at ¶ 7. In addition, the guaranty executed by Georgopoulos provides that "[i]n the event that [Van Dorn Retail] is required to retain an attorney to enforce its rights under this Guaranty, each of the undersigned agrees to pay all costs and expenses incurred by [Van Dorn Retail], including reasonable attorneys' fees." Plaintiff's Exhibits 1–3.

 Although not defining the term "reasonable", the agreement does provide that it "has been entered into in the City and State of New York and shall be interpreted according to the laws of the State of New York." Plaintiff's Exhibit 1 at ¶ 20. New Hampshire courts will honor the parties' choice of laws " 'if the contract bears any significant relationship to that jurisdiction.' " *Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.*, 968 F.2d 1463, 1467 (1st Cir.1992) (quoting *Allied Adjustment Serv. v. Heney*, 125 N.H. 698, 700, 484 A.2d 1189, 1191 (1984)); *Kentucky Fried Chicken Corp. v. Collectramatic, Inc.*, 130 N.H. 680, 684, 547 A.2d 245, 247 (1988); *see also Ellis v. Royal Ins. Co.*, 129 N.H. 326, 331, 530 A.2d 303, 306 (1987). Here, the original parties entered into the agreement in New York and Van Dorn Retail is a corporation located in New York. The contract bears a significant relationship to New York and the court will honor the parties' choice. *See Kentucky Fried Chicken Corp.*, 130 N.H. at 684, 547 A.2d at 247.

Under New York law, "attorney's fees are incidents of litigation and not recoverable unless there is specific statutory authority or a binding contract between the parties providing for such." *Zauderer v. Barcellona*, 130 Misc.2d 234, 495 N.Y.S.2d 881, 882 (Civ. Ct.1985). Section 9–504(1)(a) of the U.C.C. authorizes the parties to agree to reasonable attorneys' fees and the parties have done so.

 In determining the reasonableness of a request for attorneys' fees, the court examines "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved." *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir.1987) (quotations omitted) [9]; *see also Hovanec Builders & Developers Corp., Inc. v. Hines*, 173 A.D.2d 951, 569 N.Y.S.2d 813, 814 (3d Dep't 1991); *Zauderer*, 495 N.Y.S.2d at 883. "New York courts have stated that, as a general rule, they will rarely find reasonable an award to a plaintiff that exceeds the amount involved in the litigation." *F.H. Krear & Co.*, 810 F.2d at 1264 (citing *Colon v. Automatic Retailers Ass'n Serv., Inc.*, 74 Misc.2d 478, 343 N.Y.S.2d 874, 883 (Civ.Ct. 1972)). The amount involved in the litigation is the amount in controversy and not the amount actually awarded. *See Diamond D Enter. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19–20 (2d Cir.1992) ("amount reasonably at issue was significantly greater than the sum recovered, and the award of attorney's fees reflected this fact"), *cert. denied*, —— U.S. ——, 113 S.Ct. 2442, 124 L.Ed.2d 660 (1993). There is an exception to this rule where "the benefits of the litigation reached far beyond the amount sought in the immediate suit, such as in 'cases where there are transcending principles involved which make it economically feasible and reasonable.' " *F.H. Krear & Co.*, 810 F.2d at 1264 (quoting *Colon*, 343 N.Y.S.2d at 883 (giving as examples actions to recover small disability payments under a disability insurance policy or to recover payments under a lease which may affect the validity of the policy or lease)); *see also National Union Fire Ins. Co. v. Hartel*,

---

**9.** In *F.H. Krear & Co.*, the parties' contract had a fee shifting provision which provided that "[i]n the event of any litigation between the parties, the prevailing party shall have the right to reimbursement of reasonable attorney's fees in regards to such litigation from the other." 810 F.2d at 1255.

782 F.Supp. 22, 24 (S.D.N.Y.1992) (although it awarded attorneys' fees which exceeded amount involved in particular suit, court found insurance company would benefit from favorable precedent in numerous pending actions). Absent specific language in the contract, attorneys' fees expended to collect attorneys' fees are not recoverable. *F.H. Krear & Co.*, 810 F.2d at 1266–67 ("reimbursement for such time is not customary"); *see also Zauderer*, 495 N.Y.S.2d at 883. Where attorneys' fees are sought, counsel has burden to produce contemporaneous records of the nature of the work performed, the need for the work, and the time expended on the work. *F.H. Krear & Co.*, 810 F.2d at 1265.

■ While acknowledging that First Circuit law is not binding precedent on courts applying New York law, the court finds the following case law instructive when considering the reasonableness of attorneys' fees. When scrutinizing the request for reasonable attorneys' fees, the court should greet with "healthy skepticism" "a claim that several lawyers were required to perform a single set of tasks" and may discount "the time for two or three lawyers in a courtroom or conference, when one would do." *Lipsett v. Blanco*, 975 F.2d 934, 938 (1st Cir.1992) (quotation omitted) (upholding trial court's finding that staffing was reasonable). As the First Circuit has recently stated, the trial court can best resolve staffing issues because of its familiarity with the case's "nuances and idiosyncracies." *Id.* at 939. The court finds the following attorneys' fees requests to be unnecessary as over-staffing: (1) Jordan's attendance at Georgopoulos' December 13, 1990 deposition (7.4 hrs. at $80/hr.); (2) Jordan's attendance at a December 17, 1990 hearing (8 hrs. at $80/hr.); (3) Jordan's attendance at a December 21, 1990 hearing (5 hrs. at $80/hr.); (4) Jordan's attendance at a March 7, 1991 hearing (8.5 hrs. at $80/hr.);

(5) Tanin's attendance at a March 7, 1991 hearing (8.5 hrs at $155/hr.); (6) Jordan's preparation on June 14, 1991 for depositions (2.4 hrs. at $80/hr.); (7) Jordan's attendance at depositions on June 17, 1991 (10 hrs. at $80/hr.); (8) Jordan's attendance at depositions on December 30, 1992 (7 hrs. at $80/hr.); (9) Tanin's attendance at depositions on December 30, 1992 (5.5 hrs. at $155/hr.); (10) Jordan's attendance at a June 30, 1993 trial (4 hrs. at $80/hr.); (11) Tanin's attendance at a June 30, 1993 trial (4 hrs. at $155/hr.); (12) Tanin's attendance at a pretrial conference on September 1, 1993 (3.5 hrs. at $155/hr.). In each of the foregoing instances, one attorney could have adequately represented Van Dorn Retail's interests. The court also finds the graphic artist's expenses of $2475 not to be attorneys' fees and unnecessary given that the information was available and derived from other sources. The court further finds the law clerk's fees to be excessive for the amount of research needed to be conducted. Van Dorn Retail's counsel billed the law clerk's research as twenty-one hours at $75 per hour. This research could have been conducted in half the time by an experienced attorney with little increase in the fee ($787.50).

Van Dorn Retail also seeks the disbursements made by its counsel. Among the itemized disbursements it seeks to recoup are expenses for couriers, photocopies, telephone calls, travel, document printing, access to a library, facsimiles, filings with the court, service of process, secretarial overtime, film developing, word processing, postage, deposition transcripts, security guards, and lock changes. The court disallows the following expenses as overhead: (1) secretarial overtime ($433.75); (2) word processing ($262.50); (3) travel expenses ($199.82)[10]; (4) courier expenses ($1279.65); (5) film developing ($13.73); (6) supplies ($7.50); (7) local telephone calls ($289.62)[11]; (8) postage ($55.63);

---

10. The court has deducted the costs of Tanin's and Jordan's travel expenses. The court will allow Wiebusch's travel expenses.

11. Counsel failed to specify on some of its bills whether telephone calls were local or long distance. The court will assume these calls were local. *See Carrero v. New York City Hous. Auth.*, 685 F.Supp. 904, 909 (S.D.N.Y.1988), *aff'd in*

part, *rev'd in part on other grounds*, 890 F.2d 569 (2d Cir.1989). Counsel's November and December 1990 bills and the March, April, and May 1991 bills provide the court with enough information to determine which phone calls were long distance. Similarly, certain itemized phone calls on the June and August 1991 and the July 1993 bills provide the court with sufficient evi-

(9) access to the social law library ($13.70); and (10) facsimiles ($876.50). *See, e.g., Barrett v. United States,* Nos. 76 Civ. 381, 76 Civ. 1061, 1991 WL 60365, at *5–8 1991 U.S.Dist. LEXIS 4626, at *17–25 (S.D.N.Y. April 10, 1991) (disallowing expenses for secretarial overtime, word processing, computerized research, courier, local telephone, and postage as office overhead); *Carrero v. New York City Hous. Auth.,* 685 F.Supp. 904, 909 (S.D.N.Y.1988) (disallowing word processing and local calls as ordinary law office overhead in 42 U.S.C.A. § 1988 action for attorneys' fees); *aff'd in part, rev'd in part on other grounds,* 890 F.2d 569 (2d Cir.1989); *In re Corya,* 148 Misc.2d 723, 563 N.Y.S.2d 581, 589–90 (Surrogate's Ct.1990) (disallowing costs of messengers and computerized legal research as office overhead), *rev'd on other grounds,* 175 A.D.2d 162, 572 N.Y.S.2d 51 (2d Dep't 1991); *see also Spicer v. Chicago Bd. Options Exch.,* 844 F.Supp. 1226 (N.D.Ill.1993) (considering fax to be "a modern day messenger, part of common office expenditures, and assignable to overhead"). The defendants also should not have to pay for meals ($29.99). *Carrero,* 685 F.Supp. at 909. Counsel's bill further reveals that counsel spent $1050 on photocopies and document printing. No explanation of the charge per copy or the need for copies was given. The court finds that this disbursement was excessive and reduces it by 25% ($262.50) and thus the allowable expenses for photocopying and document printing are $787.50.

The total attorneys' fees and expenses with the foregoing deductions are $98,208.50 and $6079.16 respectively. Mindful of Georgopoulos' actions placing obstacles in the way of Van Dorn Retail's securing its rights, the court finds that the attorneys' fees as adjusted by the court are unreasonable and that an additional 25% reduction is warranted. In arriving at this conclusion, the court has considered the following factors: (1) the issues involved in this case were not particularly complex; (2) more time was spent on the case than was necessary; (3) attorneys and paralegals duplicated their efforts; (4) counsel unnecessarily filed documents with the court [12]; (5) attorneys and paralegals performed clerical functions; and (6) the attorneys' fees and costs as submitted by counsel are approaching the amount of the debt involved.

Van Dorn Retail is awarded to $73,656.38 in attorneys' fees and $6079.16 in expenses.

### Conclusion

For the foregoing reasons, the court finds that Van Dorn Retail conducted the sale in a commercially reasonable manner. Van Dorn Retail is awarded $30,239 for the deficiency due on the debt, $73,656.38 in attorneys' fees and $6079.16 in expenses.

Pursuant to amended paragraph 5 of the agreement, Van Dorn Retail is also entitled to interest on the portion of the debt (exclusive of attorneys' fees) that exceeded $100,000 during the sale (from March 8, 1991 through April 9, 1991).[13] While Van Dorn Retail calculated its total damages based on all the debt, deficiency, expenses, attorneys' fees and costs, and interest permitted by amended paragraph 5 of the agreement,[14] the court has found the amount of the damages including the debt to be different than that calculated by Van Dorn Retail. Van Dorn Retail has not had the opportunity to adjust

---

dence to determine which phone calls were long distance. The court further notes that the February 1994 bill contains a discrepancy concerning the amount expended on telephone calls. The section listing the number of phone calls provides the amount owed is $1.61. However, the summary of the disbursements which counsel used to calculate the total expenses provides the amount owed is $12.23. The court has used the $12.23 figure.

**12.** For example, after the sale Van Dorn Retail filed a report of sale with the court. Neither Judge Lagueux's order or Magistrate Barry's report and recommendation required such a filing.

In response to the court's inquiry, counsel for Van Dorn Retail stated it filed the report as a precaution because the defendant Georgopoulos at that time was pro se.

**13.** In determining the amount of the debt prior to Van Dorn Retail gaining possession of Jim's on March 8, 1991, the court credited Van Dorn Retail for the interest to which it was entitled pursuant to amended paragraph 5 of the agreement.

**14.** *See* Plaintiff's Exhibit 71; Motion to Amend Damage Calculation.

the amount of interest the defendants owe on the portion of the debt (exclusive of attorneys' fees) that exceeded $100,000 during the sale based on the court's finding that the debt exclusive of attorneys' fees was $135,-555.74 at the time Van Dorn Retail took possession of Jim's. If Van Dorn Retail does not intend to seek recovery of this interest, it shall notify defense counsel and the court by May 31, 1994. If Van Dorn Retail intends to seek recovery of this interest, it shall proceed as follows by May 31, 1994. Using the formula provided in amended paragraph 5 of the agreement, Van Dorn Retail shall submit an itemized calculation of the interest on the debt (exclusive of attorneys' fees) which exceeded $100,000 during the sale of the collateral. Van Dorn Retail shall use the court's finding of $135,555.74 as the amount of the debt prior to the sale. The parties shall make every effort to agree on the interest calculation, and if they cannot do so, the defendants may file an objection to Van Dorn Retail's calculation by June 8, 1994.

SO ORDERED.